602 A.2d 830

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Neil F. DUNKLE, Appellee.**

Supreme Court of Pennsylvania.

Submitted May 6, 1991.

Decided Jan. 22, 1992.

170

Kenneth A. Osokow, Dist. Atty., for appellant.
Ronald C. Travis, Williamsport, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY,
McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

We are called upon to decide whether the trial court erred in permitting expert testimony about the behaviors exhibited by children who have been sexually abused was error in a case in which the appellee was charged with sexual abuse of a minor. Additionally, we must decide whether the expert testimony was properly admitted to explain why sexually abused children may not recall certain details of the assault, to explain why they may not give complete

details, and to explain why they may delay reporting the incident. Finally, we address the issue raised by the appellee in his cross-appeal concerning the propriety of admitting prior incidents of a sexual nature that occurred between the appellee and the victim.

We hold that expert testimony concerning typical behavior patterns exhibited by sexually abused children should not have been admissible in the case before us. We also hold that it was error to permit an expert to explain why sexually abused children may not recall certain details of the assault, why they may not give complete details, and why they may delay reporting the incident. Lastly, we hold that the trial court did not err in permitting testimony about prior sexual incidents between the appellee and the victim.

## FACTUAL AND PROCEDURAL HISTORY

The appellee, Neil Dunkle, was charged with rape, indecent assault, corruption of minors, simple assault and criminal attempt to commit involuntary deviate sexual intercourse. Following a jury trial, he was found guilty of all charges except rape and was sentenced to not less than two years, nor more than four years on one count and a concurrent sentence not less than 18 months nor more than three years on another count. The acts for which he was convicted concerned a sexual assault upon his teenage stepdaughter.

These charges arose out of a complaint made by the appellee's stepdaughter that in April of 1983, the appellee entered her bathroom while she was showering and, after forcing her to the floor, sexually assaulted her, forced her to engage in oral intercourse, and raped her.

During the trial, the Commonwealth called Susan Slade to testify as an expert witness. In reliance on *Commonwealth v. Baldwin,* 348 Pa.Super. 368, 502 A.2d 253 (1985), *appeal denied,* and over the objection of the defense, the trial court permitted her to testify. Ms. Slade (who is not a psychiatrist or a psychologist) testified about behavior pat-

terns that occurred in children who had been sexually abused. Additionally, she testified about why a victim would delay reporting an offense, why a victim might be unable to recall exact dates and times of an alleged offense, and why victims of sexual abuse omitted details of the incident when they first told their story. At no time during her testimony did the expert witness relate any of her testimony to the child in question.

According to the complaining witness, the appellee had assaulted her in April, 1983. The victim did not report the offenses to anyone in authority until April 1986. Additionally, there was testimony that the victim omitted details of the assault when she first reported the incident and was unable to recall specific dates and times.

In addition to the expert testimony, there was testimony by those who knew the victim concerning changes in her behavior after the alleged assault occurred. There was also testimony that the appellee had often watched the victim while she was showering by peering through a moveable panel inside his closet. The victim also testified that the appellee had fondled her breasts while she pretended to be asleep.

Following the conviction, the appellee appealed and the Superior Court reversed, holding that the expert's testimony was used to buttress the credibility of the victim in violation of *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986). We granted the Commonwealth's petition for allowance of appeal to address the issue of whether the expert witness should have been permitted to testify. We also granted appellee's cross-petition to address the issue of whether appellee's prior sexual misconduct toward the victim, which consisted of spying on her and fondling her breasts, should have been admissible.

## DISCUSSION

In order for us to adequately explain our reasoning, we divide this opinion into three sections; the first dealing with

the testimony concerning the behavior patterns of sexually abused children—the so-called "Child Sexual Abuse Syndrome." The second section of the opinion addresses the testimony about why children delay reporting incidents of child abuse. The third section discusses prior sexual incidents between the appellee and the victim.

## TESTIMONY ABOUT THE "CHILD SEXUAL ABUSE SYNDROME"

 Testimony concerning typical behavior patterns exhibited by sexually abused children is also referred to as the "Sexually Abused Child Syndrome," "the Child Abuse Syndrome," and the "Child Sexual Abuse Accommodation Syndrome")[1].

This Court has long recognized that in order for an expert to testify about a matter, the subject about which the expert will testify must have been "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Commonwealth v. Nazarovitch*, 496 Pa. 97, 101, 436 A.2d 170, 172 (1981), quoting *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013, 1014 (D.C.1923) (the so-called "*Frye* standard"). In its brief, the Commonwealth refers to the "Child Abuse Syndrome." This syndrome is an attempt to construct a diagnostic or behavioral profile about sexually abused children. The existence of such a syndrome as either a generally accepted diagnostic tool or as relevant evidence is not supportable. Several commentators note that the so-called "sexual abuse syndrome" is not specific enough to sexually abused children to be accurate.

The principal flaw with the notion of a specific syndrome is that no evidence indicates that it can discriminate between sexually abused children and those who have experienced other trauma. Because the task of a court is to make such discriminations, this flaw is fatal. In order for a syndrome to have discriminant ability, not only must

1. *See generally* Summit, "The Child Abuse Sexual Accommodation Syndrome," *Abuse and Neglect* (1987).

it appear regularly in a group of children with a certain experience, but it also must not appear in other groups of children who have not had that experience.[2]

According to the literature on the subject, there is no one classical or typical personality profile for abused children.[3] The difficulty with identifying a set of behaviors exhibited by abused children is that abused children react in a myriad of ways that may not only be dissimilar from other sexually abused children, but may be the very same behaviors as children exhibit who are not abused. "Researchers have been unsuccessful in their attempts to find common reactions that children have to sexual abuse. In fact, research has indicated that children react in incredibly diverse ways to sexual abuse." [4] As another commentator aptly notes:

[O]ne cannot reliably say that a child exhibiting a certain combination of behaviors has been sexually abused rather than, for instance, physically abused, neglected, or brought up by psychotic or antisocial parents. Although future research may support identification of victims by

2. Haugaard & Reppucci, *The Sexual Abuse of Children, A Comprehensive Guide to Current Knowledge and Intervention Strategies,* 177–178 (1988).

3. *See, e.g.,* Rosenfield, *The Clinical Management of Incest and Sexual Abuse of Children,* 22 Trauma 2 (Oct.1980), who writes: "It is impossible to make a general statement about the effects of sexual abuse on children. Children react differently to different situations depending on a number of variables that may be operating at the time of the occurrence." *Id.* at 3. *See also,* Martin & Beezely, "Personality of Abused Children," in *The Abused Child: A Multidisciplinary Approach to Developmental Issues and Treatment* (H. Martin & C. Kempe eds. 1976); and Schulz, *The Child as a Sex Victim: Socio-Legal Perspectives,* 4 Victimology: A New Focus 177 (I. Drapkin & E. Viano eds. 1975). These studies are quoted in Note, *The Unreliability of Expert Testimony on the Typical Characteristics of Sexual Abuse Victims,* 74 Geo.L.J. 429, 440–441 (1985).

4. McCord, *Syndromes, Profiles and Other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases,* 66 Or.L.Rev. 19, 41 (1986). For a detailed discussion of the psychological research supporting this conclusion, *See,* McCord, *Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecutions: A Foray Into the Admissibility of Novel Psychological Evidence,* 77 J.Crim.L. & Criminology 1 (1986).

their behaviors, such identification is currently not possible.[5]

In the case *sub judice*, the expert testified that the "victim usually experiences initially a lot of fear of the offender, a lot of anger towards the alleged offender." The "victim is usually very confused," "the children initially feel very very guilty." The expert also testified that the "child is usually very confused over the relationship." The child "frequently expresses many of the positive things that weren't in the relationship." "Child victims of sexual abuse usually have a very low self esteem." Additionally, "children frequently withdraw after the disclosure of sexual abuse, they will isolate themselves [and] not want contact with other people." "[T]hey are not performing as well as they did at school, they are disassociating themselves with common practices or common friends at the school, they're [sic] grades frequently will fall, they have [an] inability to concentrate on their school work."

While all of these behavior patterns may well be typical of sexually abused children, even a layperson would recognize that these behavior patterns are not necessarily unique to sexually abused children. They are common to children whose parents divorce[6] and to psychologically abused children.[7]

In one study about children whose parents divorce, the author described many behaviors exhibited by children of

5. Haugaard & Reppucci, *supra*, note 2, p. 178.
6. Wallerstein & Kelly, *Surviving the Breakup, How Children and Parents Cope with Divorce* (1980).
7. In a study on psychologically maltreated children, the authors note the following behaviors that may be exhibited:
 **Children:** feel unloved, inferior, low self-esteem, negative view of the world; anxiety and aggressiveness turned or outward; inadequate social behavior.
 **Adolescents:** feelings similar to children's but response may be more severe; may become truants, runaways, destructive, depressed, suicidal.
 Gabarino, Guttmann, & Seeley, *The Psychologically Battered Child* Table 2, Components Involved in Identification of Psychological Maltreatment, 69 (1986).

divorced parents.[8] "Some clung to the remaining parent, whimpering or crying when the parent left...." [9] "Regression was a common response among the youngest children." [10] "Lapses in toilet training and increased masturbatory activity were noted." [11] The author also noted a marked rise in aggression, guilt, bewilderment and macabre fantasy.[12]

In another study of sexually abused children, the authors remark that *all* maltreated children may react similarly— whether the victims of sexual abuse or another type.

The degree to which sexually abused children differ from other maltreated children or children from chaotic and violent households may be small (Erickson & Egeland, 1987; Wolfe & Mosk, 1983; Wolfe, Wolfe, & LaRose, 1986). In the best study to date (Erickson & Egeland, 1987; Erickson, Egeland, & Pianta, 1989), 267 children were followed prospectively, and 60 to 86 were identified as maltreated at different ages through age 6 years, including 11 sexually abused children. [The study concluded]: *There are more similarities than differences among the groups of maltreated children....* All have difficulty meeting task demands at school, all seem to have an abiding anger, all are unpopular with their peers, and all have difficulty functioning independently in school and laboratory situations. *The problems are not abuse-specific;* [the authors go on to state] [t]he common problems .. all can be tied to the lack of nurturance .. all [parents] failed to provide sensitive, supportive care for their child.[13]

Based on the foregoing, it is clear that the testimony about the uniformity of behaviors exhibited by sexually

**8.** Wallerstein and Kelly, *Surviving the Breakup, supra,* note 6.

**9.** *Id.* at 57.

**10.** *Id.*

**11.** *Id.*

**12.** *Id.* at 58–62.

**13.** Freidrich, *Psychotherapy of Sexually Abused Children and Their Families,* 25 (1990) (emphasis supplied).

abused children is not "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Commonwealth v. Nazarovitch*, 496 Pa. 97, 101, 436 A.2d 170, 172 (1981) and should have been excluded.[14]

Intertwined with the notion of "general acceptance in the particular field" is the understanding of what constitutes relevant and therefore admissible evidence. We have long held that "[a]ny analysis of the admissibility of a particular type of evidence must start with a threshold inquiry as to its relevance and probative value." *Commonwealth v. Walzack*, 468 Pa. 210, 218, 360 A.2d 914, 918 (1976). Relevant evidence "is evidence that in some degree advances the inquiry...." *Id.*, quoting McCormick, Evidence § 185 at 437–38 (2d ed. 1972). Further, as we stated in *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976), "[i]t must be determined first if the inference sought to be raised by the evidence bears upon a matter in issue in the case and, second, whether the evidence 'renders the desired inferences more probable than it would be without evidence.' " 468 Pa. at 284, 361 A.2d at 292, quoting *Commonwealth v. Stewart*, 461 Pa. 274, 278, 336 A.2d 282, 284 (1975).

The expert testimony about the behavior patterns exhibited by sexually abused children does not meet this threshold determination. While it may "bear upon a matter in issue," it does not render the desired inference more probable than not. It simply does not render any inference at all. Rather, it merely attempts—in contravention of the rules of evidence—to suggest that the victim was, in fact, exhibiting symptoms of sexual abuse. This is unacceptable.

14. In addressing the Child Abuse Sexual Syndrome profile, the Supreme Court of Utah stated:
 Suffice it to say, then, that the literature in the area is disparate and contradictory and that the child abuse experts have been unable to agree on a universal symptomology of sexual abuse, especially a precise symptomology that is sufficiently reliable to be used confidently in a forensic setting as a determinant of abuse.
*State v. Rimmasch*, 775 P.2d 388, 401 (Utah 1989).

The expert witness also testified that sexually abused children exhibit the following behaviors: Runaway behavior, anger, rebellion, acting out, becoming promiscuous, getting involved with drugs, alcohol, not doing school work, regression to earlier behavior, suicide attempts or thoughts of suicide, depression, eating disorders, nightmares, and bed wetting. It is virtually impossible to clinically describe the elements of the "child abuse syndrome" with any realistic degree of specificity.[15]

We do not believe that the testimony in question was probative. Clearly, drug and alcohol abuse, eating disorders, low self-esteem and not doing school work are common phenomena not solely related to child abuse. To permit the jury to speculate that they might be, however, violates every notion of what constitutes probative and relevant evidence. It is neither scientifically supportable nor legally supportable. Such a laundry list of possible behaviors does no more than invite speculation and will not be condoned.[16]

15. Richard A. Gardner, M.D., a practicing child psychiatrist in a recent book entitled *Sex Abuse Hysteria, Salem Witch Trials Revisited* (1991), contends that many normal behaviors are often taken as "evidence" of child abuse, namely bedwetting in young children, nightmares, temper tantrums, and masturbation. *Id.* at 60–65. Furthermore, many of the so-called abnormal behaviors attributed to victims of sexual abuse in fact have "nothing to do with Sex Abuse." These include "depression, phobias, tics, obsessive compulsive rituals, conduct disorders, antisocial behavior, hyperactivity, attention deficit disorder, headaches, gastrointestinal complaints (nausea, cramps, diarrhea), musculoskeletal complaints, etc." *Id.* at 65.

16. In her book, *Handbook on Sexual Abuse of Children, Assessment and Treatment Issues,* 77 (1988), Lenore Walker includes a compilation of a study showing what percentage of sexually abused children exhibited what behaviors. This study was funded by the National Institute of Mental Health and was meant to describe the effects of sexual abuse on a sample of 369 sexually abused children.

**Table 5.1 Proportion of Abused Sample Exhibiting Checklist Symptoms**

| Symptom | % Present |
|---|---|
| Panic/anxiety attacks | 5.7 |

Perhaps the lack of probative value of this evidence is

| | |
|---|---|
| Behavioral regression | 3.8 |
| Runs away/takes off | 2.7 |
| Excessive autonomic arousal | 4.6 |
| Depression | 18.7 |
| Withdrawal from usual activity or relations | 15.2 |
| Sexually victimizes others | 3.0 |
| Generalized fear | 11.7 |
| Suicidal attempts | 1.9 |
| Body image problems | 7.9 |
| Repressed anger/hostility | 19.2 |
| Daydreaming | 13.8 |
| Major Problems with police | 0.3 |
| Eating disorders | 0.8 |
| Psychotic episode | — |
| Overly compliant/too anxious to please | 13.8 |
| Drug/alcohol abuse | 2.2 |
| Age-inappropriate sexual behavior | 7.9 |
| Hurts self physically | 1.4 |
| Minor problems with police | 3.3 |
| Fearful of abuse stimuli | 30.1 |
| Suicidal thoughts or actions | 5.7 |
| Psychosomatic complaints | 10.0 |
| Ritualistic behavior | 1.1 |
| Indiscriminate affection-giving or receiving | 6.5 |
| Low self-esteem | 32.8 |
| Places self in dangerous situations | 4.9 |
| Violent fantasies | 2.4 |
| Emotional upset | 22.8 |
| Prostitution | 0.8 |
| Obsessional, repetitive/recurrent thoughts | 5.4 |
| Shoplifting/stealing | 2.2 |
| Nonacademic school behavior problems | 9.2 |
| Nightmares/sleep disorders | 20.1 |
| Inability to form/maintain relationships | 8.7 |
| Academic problems | 15.4 |
| Aggressive behavior | 14.4 |
| (continued on next page) | |
| Inappropriate/destructive peer relationships | 7.0 |

As this chart graphically demonstrates, sexually abused children (1) cannot be fit into any specific behavior patterns; (2) for every symptom that was exhibited by any percentage, an even larger number do not exhibit that symptom; and (3) not one, single symptom was exhibited by a majority of sexually abused children. Clearly, these types of percentages cannot constitute probative evidence.

best understood in comparison to the so called "battered child syndrome," a diagnostic tool used by physicians to determine whether a child is the likely subject of intentional abuse or accidental injury. In the battered child syndrome, physicians look for the following characteristics:

> The diagnosis of battered child syndrome is used in connection with young children and is based upon a finding of multiple injuries in various stages of healing, primarily multiple fractures, soft tissue swelling or skin bruising. Also pertinent to the diagnosis is evidence that the child is generally undernourished, with poor hygiene, and that the severity and type of injury is inconsistent with the story concerning the occurrence of the injuries offered by the parents or those who were caring for the child.

*Commonwealth v. Rodgers,* 364 Pa.Super. 477, 486, 528 A.2d 610, 614 (1987), *appeal denied,* 518 Pa. 638, 542 A.2d 1368 (1988). In *Rodgers,* the physician discussed the *physical* findings of the child at issue and stated a belief as to whether that child's injuries appeared to have been intentionally inflicted.[17] *See also, Commonwealth v. Paquette,* 451 Pa. 250, 255, 301 A.2d 837, 840 (1973). That type of testimony—explicit, probative and relevant—stands in stark contraposition to the type of testimony admitted in the case before us. The "battered child syndrome" evidence is unique to physically abused children and is not overly general. Thus, it can be argued that such testimony can make it "more likely than not" that the injuries were intentionally inflicted.

The damage created by this testimony was also compounded by the testimony about those who knew the child in question. There was testimony admitted about the behaviors exhibited by the child after the alleged incident. As such, the prosecution's introduction of the testimony by those who observed the child served to confirm certain

---

**17.** Although the Superior Court has permitted testimony about the "battered child syndrome" in *Rodgers,* this Court has not yet expressed an opinion on the subject.

behavior patterns that the expert suggested were exhibited by abused children. Permitting an expert to testify about an unsupportable behavioral profile and then introducing testimony to show that the witness acted in conformance with such a profile is an erroneous method of obtaining a conviction. For this reason, we hold that the expert should not have been permitted to testify about behavior patterns generally exhibited by abused children and that the error requires reversal.

## TESTIMONY CONCERNING DELAYS IN REPORTING AND OMISSIONS IN REPORTING

The remainder of the expert witness's testimony concerned explanations for (1) why a sexually abused child would delay reporting the incident to family members; (2) why abused children omit details of the incident; and (3) why a sexually abused child may have an inability to recall dates or times of the incident.

In addition to expert testimony meeting the tests of relevancy and the *Frye* standard of admissibility, expert testimony is admitted only when the subject matter is beyond the knowledge or experience of the average layman. When the issue is one of common knowledge, expert testimony is inadmissible. *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976).

It is understood why sexually abused children do not always come forward immediately after the abuse: They are afraid or embarrassed; they are convinced by the abuser not to tell anyone; they attempt to tell someone who does not want to listen; or they do not even know enough to tell someone what has happened. In the case *sub judice*, the expert testified that a "[m]ajor reason would be any threats that were made to the child." Also, she stated that "[t]hey also could not disclose for fear of embarrassment, for fear they are damaged in some way, they are not a perfect person." "[T]hey do not disclose out of fear of loss that they may have to leave the home, that someone within the home may have to leave them...." All of these rea-

sons are easily understood by lay people and do not require expert analysis.

In *Commonwealth v. Snoke,* 525 Pa. 295, 580 A.2d 295 (1990) we recognized that children are different from adults and may not appreciate the need to come forward:

> Where no physical force is used to accomplish the reprehensible assault, a child victim would have no reason to promptly complain of the wrong-doing, particularly where the person involved is in a position of confidence. Where such an encounter is of a nature that a minor victim may not appreciate the offensive nature of the conduct, the lack of a complaint would not necessarily justify an inference of a fabrication.

525 Pa. at 303, 580 A.2d at 299. We have also recognized, however, that the reasons children come forward are perhaps not always innocent. In *Commonwealth v. Lane,* 521 Pa. 390, 555 A.2d 1246 (1989), we stated:

> The real question in matters concerning youthful complainants is whether the immaturity of the child occasioned the delay as opposed to a design to deceive. In determining whether or not the delay reflects the insincerity of the complainant, the maturity is merely an additional factor to be considered by the jury in deciding the question.

521 Pa. at 398–99, 555 A.2d at 1251. In reaching this conclusion, we noted that the reasons for the delay may be innocent, or they may not be innocent, but may include blaming another to protect a guilty parent, acting out of revenge prompted by dislike.

Yet these decisions also suggest that the reasonable explanations for why children do not come forward are well within the range of common experience; reasons that are understood by the jury.[18]

18. We note that our courts have allowed more latitude in the elicitation of testimony from children than from adults. *See e.g., Commonwealth v. Pankraz,* 382 Pa.Super. 116, 554 A.2d 974 (1989), appeal denied, 522 Pa. 618, 563 A.2d 887 (1989) (permitting four year old victim of father's sexual abuse to testify while sitting on her grand-

In the final analysis, the reason for the delay must be ascertained by the jury and is based on the credibility of the child and the attendant circumstance of each case. We believe that the evidence presented through the fact witnesses, coupled with an instruction to the jury that they should consider the reasons why the child did not come forward, including the age and circumstances of the child in the case, are sufficient to provide the jury with enough guidance to make a determination of the importance of prompt complaint in each case.[19] Not only is there no *need* for testimony about the reasons children may not come forward, but permitting it would infringe upon the jury's right to determine credibility. *Commonwealth v. Seese,* 512 Pa. 439, 517 A.2d 920 (1986); *Commonwealth v. Davis,* 518 Pa. 77, 541 A.2d 315 (1988); *Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355 (1988).

We are also convinced that sexually abused children may sometimes omit the horrid details of the incident for the same reasons that they do not always promptly report the abuse; fear, embarrassment and coercion by the abusing adult. Additionally, it is often clear that children do not always comprehend what has occurred and the need for complete description of the events. Children often omit

mother's lap did not constitute an abuse of discretion); *Commonwealth v. Willis,* 380 Pa.Super. 555, 552 A.2d 682 (1988) (plurality opinion), *appeal denied,* 522 Pa. 583, 559 A.2d 527 (1989) (noting that questions directed at children on both direct and cross-examination should be direct rather than convoluted or compound questions, and that questions should be phrased in simple language).

It is a long-standing principle that "[t]he examination of witnesses has always been and still remains subject to the control of the trial court in which there is vested a large discretion." *Commonwealth v. Dress,* 354 Pa. 411, 414, 47 A.2d 197, 199 (1946). We are convinced that our trial judges are fully capable of ensuring that relevant and probative testimony concerning a child's reporting of sexual incidents will be properly elicited without the aid of expert witnesses.

**19.** Although the standard jury instructions concerning credibility do not contain an instruction about considering the child's age, we have approved of such a charge in *Commonwealth v. Snoke,* 525 Pa. 295, 580 A.2d 295 (1990). In that case, we found that the trial judge's instructions concerning credibility were proper where he stated, *inter alia,* "you should consider whether the witness' testimony was [a]ffected by reason of youth." *Id.,* 525 Pa. at 304, n. 2, 580 A.2d at 299, n. 2.

details in describing many events, and it is no wonder that they often do not fully describe the details of an especially upsetting event.

However, we do not believe that there is any clear need for an expert to explain this to a jury. This understanding is well within the common knowledge of jurors. Additionally, the prosecutor is able to elicit such information from the child during testimony. As such, the **need** for expert testimony in this area is not apparent.

As with the issue of prompt complaint, however, there may be other reasons why children omit details; namely, the story they are relating is fabricated or imagined. In either event, the credibility of the child may well be measured by the reasons they relate for omitting details. As such, we believe that to permit expert testimony to buttress the testimony of the child would be to impermissibly interfere with the jury's function to judge credibility. It must be remembered that the jury is not evaluating the child as they would an adult, but in terms of their own understanding of children. Thus, while a jury may judge an adult harshly who omits details of a disturbing incident, there is no reason to think a jury will not be sensitive to the fact that a child relating the event may not be as specific as the adult would be. We are confident that jurors are well equipped to judge the credibility of children without need of expert advice.

The final issue we address is whether expert testimony is appropriate to explain why a child may have an inability to recall dates or times of the incident. It is universally understood that children, especially young children, may not be able to recall with specificity when things occurred to them. So too, when disclosure is delayed, the child may not be able to remember specific dates or times due simply due to the passage of time. Again, however, an expert simply is not necessary to explain this to a jury.

A child's recollection of the event is another factor for the jury to determine when weighing credibility and we believe it would impermissibly infringe upon the their determina-

tion to permit expert testimony on this point. As such, we find that it was error for the trial court to admit an expert's testimony on the subject of delay of reporting, omission of details, and the inability to recall dates and times.

We are all aware that child abuse is a plague in our society and one of the saddest aspects of growing up in today's America. Nevertheless, we do not think it befits this Court to simply disregard long-standing principles concerning the presumption of innocence and the proper admission of evidence in order to gain a greater number of convictions. A conviction must be obtained through the proper and lawful admission of evidence in order to maintain the integrity and fairness that is the bedrock of our jurisprudence. No shortcuts are permissible that erode this concept, no matter how noble the purpose. For these reasons, we affirm so much of the decision of the Superior Court which held that the testimony of the Commonwealth's expert should have been excluded.

## ADMISSIBILITY OF PRIOR SEXUAL MISCONDUCT BETWEEN THE APPELLEE AND THE VICTIM

■ The Superior Court held that the appellee had waived the issue of whether prior sexual misconduct by the appellee toward the victim was improperly admitted. In an advisory fashion, that Court then when on to address the substantive issue in order to provide guidance to the trial court upon retrial. Insofar as we disagree with the Superior Court concerning the admissibility of the evidence, we are constrained to address the substance of the issue and need not address whether the issue was waived.

The testimony complained about consisted of statements that the appellee watched the victim from a secret, moveable panel in his closet while she showered and that the appellee fondled the victim's breasts while she pretended to be asleep.

The Superior Court held that such testimony should be inadmissible upon retrial, stating:

Despite the morally repugnant nature of these alleged acts and the crimes for which appellant has been convicted, we are constrained to find that testimony regarding these acts was improperly admitted for the reason that the isolated occurrence of prior misconduct testified to by the victim simply do not constitute "a series of acts indicating continuousness of sexual intercourse."

Opinion of the Superior Court at page 5, quoting *Commonwealth v. Bell*, 166 Pa. 405, 31 A. 123 (1895). In dissent, Judge Kelly stated that "[t]he challenged evidence taken together, and in the context of the charges presented in this case, plainly gave rise to a reasonable inference that *appellant was engaged in a continuous and gradually escalating course of sexually exploitive and abusive conduct toward the victim.*" (Emphasis in original). We agree with the position articulated by Judge Kelly.

In *Bell*, the Supreme Court held that evidence of illicit relations between the parties, even beyond the statute of limitations, was admissible "if it is one of a series of acts indicating continuousness of sexual intercourse." 166 Pa. at 412, 31 A. at 124. The Superior Court on numerous occasions has admitted testimony concerning prior sexual misconduct of a defendant toward a victim. *See e.g. Commonwealth v. Leppard*, 271 Pa.Super. 317, 413 A.2d 424 (1979); *Commonwealth v. Rodriguez*, 343 Pa.Super. 486, 495 A.2d 569 (1985); *Commonwealth v. McClucas*, 357 Pa.Super. 449, 516 A.2d 68 (1986).

We do not believe that the appellee had to engage in the same, exact sexual misconduct for which he was charged in order for the testimony to be admissible. Rather, the testimony concerning his misconduct was admissible to show that the appellee's sexual misconduct was of a continuing and escalating nature. McCormick on Evidence states that prior sexual misconduct with the victim is admissible "[t]o show a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial." McCormick, Evidence § 190, at 449 (2d ed. 1972). The Courts of the Commonwealth have previously relied on

this section of that treatise as authoritative. *See, e.g.,* *Commonwealth v. Claypool,* 508 Pa. 198, 204, n. 2, 495 A.2d 176, 179, n. 2 (1985); *Commonwealth v. Buser,* 277 Pa.Super. 451, 454, 419 A.2d 1233, 1235 (1980). We hold that the testimony in question "shows a passion or propensity for illicit sexual relations" with the victim and conclude that the evidence is admissible upon retrial.

The decision of the Superior Court is affirmed in part and reversed in part and the case is remanded to the trial court for retrial consistent with this opinion.

McDERMOTT, J., files a concurring and dissenting opinion.

LARSEN, J., files a dissenting opinion in which PAPADAKOS, J., joins.

McDERMOTT, Justice, concurring and dissenting.

As Mr. Justice Larsen notes, the majority, in its opinion, relies upon experts to reach the conclusion that the Commonwealth's experts cannot provide testimony regarding a subject upon which other experts cannot agree; and, therefore, such testimony should be inadmissible based, I gather, on its unreliability as scientific proof. If the latter is the basis of the majority's holding on the first issue, I agree with it for the nonce. However, I do not agree with the majority's implication that there will never come a time when evidence of this type can become sufficiently reliable that it may be admitted.

Regarding the majority's second issue, I believe the majority is ascribing to the average juror incredible sophistication regarding the effect of sexual abuse on the workings of a young mind. Moreover, to say, as the majority does, that "[a]ll of these reasons (i.e. reasons for delaying the report of such abuse) are easily understood by lay people and do not require expert analysis," [1] "[t]his understanding (i.e. referring to why victims sometimes omit details) is well

1. Maj. op. pp. 181–182.

within the common knowledge of jurors," [2] and "[i]t is universally understood that children, especially young children, may not be able to recall with specificity when things occurred to them," [3] basically trivializes an entire field of child psychology by implying that everybody already knows these facts as surely as they know that apples fall down.

Finally, it greatly concerns me that the majority would continue to permit, as no doubt they must, defense counsel to attack the credibility of the child-victim on all of these grounds, yet afford the Commonwealth no means to parry these defense tactics; this, despite the fact that on this point there is sufficient expert unanimity to conclude that such evidence is reliable.[4]

Therefore, as to the majority's holding on the second issue, I dissent and would allow expert testimony that did not specifically refer to the victim in the trial at hand.

Finally, regarding the cross appeal of Mr. Dunkle, I agree with the majority's disposition.

LARSEN, Justice, dissenting.

I vigorously dissent to the majority's remand of this case for retrial. Today, the majority completely rules out the use of expert testimony to aid a jury in understanding a subject which is shrouded in myth and shame and about which the average citizen/juror knows little or nothing. To add insult to injury, the majority supports its holding atop a fragile house of cards consisting of the writings of various "authorities" whose studies and opinions carry only as much legal weight as any other untested authority who can be found to espouse opinions that are in direct opposition to the "authorities" cited. It is anomalous, in fact, that the majority uses experts to convince the legal community of its position due to the legal community's ignorance and yet

2. Maj. op. p. 184.
3. Maj. op. p. 184.
4. Indeed, if one takes the majority at its word, there is such unanimity that it has become accepted common knowledge.

concludes that such information is a matter of common knowledge to the average juror.

The issue raised by the Commonwealth in its appeal to this Court is whether the admission of expert testimony regarding the behavioral characteristics of the victims of sexual abuse invaded the exclusive province of the jury to determine the credibility of witnesses, where the expert did not testify as to the credibility of sexual abuse victims in general, did not testify that the victim in this case was a victim of sexual abuse, and did not testify that the victim was credible. The issue raised by the cross-appellant, Neil F. Dunkle, is whether Dunkle waived his objection to the admission of evidence of his prior misconduct with the victim by failing to object to it during trial on the basis of remoteness and on the basis that the prior misconduct did not constitute a continuous course of conduct.[1] I shall address these issues seriatim.

Dunkle was charged on June 30, 1986, with rape, indecent assault, corruption of minors and criminal attempt to commit involuntary deviate sexual intercourse. The charges arose out of an incident occurring in April of 1983, involving Dunkle's sexual assault upon his fourteen year old stepdaughter as she was taking a shower. Following a jury trial in the Court of Common Pleas of Lycoming County, Dunkle was found guilty of indecent assault, corruption of minors and criminal attempt to commit involuntary deviate sexual intercourse. He was acquitted of the charge of rape. The trial court denied Dunkle's post-verdict motions in arrest of judgment and for a new trial. Dunkle was sentenced to concurrent sentences of imprisonment totalling two to four years.

Dunkle filed an appeal to Superior Court which reversed by a divided panel and remanded for a new trial. *Commonwealth v. Dunkle*, 385 Pa.Super. 317, 561 A.2d 5 (1989).

---

1. Superior Court ruled, in the interest of judicial economy, that this evidence would not be admissible at Dunkle's retrial. Because Superior Court determined that it could not remand the case on the basis of this issue due to waiver, it is evident that Dunkle raises the issue to this Court in an exercise of caution.

Superior Court determined that the admission of the expert testimony constituted reversible error and that, although Dunkle had waived his objection to the evidence of prior acts involving the victim on the ground asserted in his appeal, that evidence would be inadmissible at Dunkle's retrial. Both the Commonwealth and Dunkle filed petitions for allowance of appeal to this Court. We granted both petitions, and I would reverse the order of the Superior Court.

The decision whether to admit or exclude evidence is entrusted to the discretion of the trial judge, who is not to be reversed unless an abuse of that discretion is shown. *Commonwealth v. Boyle*, 498 Pa. 486, 447 A.2d 250 (1982). Moreover, this Court has stated:

> An abuse of discretion is more than just an error of judgment and, on appeal, a trial court will not be found to have abused its discretion unless the record discloses that "the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will."

*Commonwealth v. Lane*, 492 Pa. 544, 549, 424 A.2d 1325, 1328 (1981) (citations omitted). As there has been no allegation of partiality, prejudice, bias or ill-will on the part of the trial court herein, we must determine whether the admission of the expert testimony in this case was manifestly unreasonable.

During the prosecution's case, a Child Protective Service Supervisor for the Department of Children and Youth in Lycoming County was permitted to testify as an expert witness, over Dunkle's objection, about the behavioral characteristics of child sexual abuse victims.[2] The expert testi-

2. The majority points out that the expert witness herein was not a psychiatrist or a psychologist. Maj. op. at 171. Her lack of a professional degree has absolutely no bearing upon her qualification as an expert witness. In this Commonwealth, there is a liberal standard for the qualification of an expert witness, i.e., "if a witness has any reasonable pretension to specialized knowledge on the subject matter under investigation he may testify and the weight to be given to his evidence is for the [fact finder]." *Commonwealth v. Gonzalez,* 519 Pa. 116, 128, 546 A.2d 26, 31 (1988) (plurality opinion). That pretension to specialized knowledge may be based upon background,

fied, based upon her personal observations of approximately 500 such victims, that child sexual abuse victims may delay reporting incidents of abuse by a family member for any of several reasons. These include threats made against the child, fear that the family will be split up as a consequence of reporting an incident, embarrassment, fear that the child will not be believed, and pressure by the family to recant. This testimony was presented in response to the inference raised by Dunkle that the victim's three year delay in reporting the assault was a result of insincerity or fabrication.

The expert also testified that it is common for child sexual abuse victims to be unable to recall dates, times, and other factual details of the incidents, either because the incidents were frequent, the incidents occurred long before they were reported, or the child has repressed painful thoughts from conscious memory. This testimony was presented in response to Dunkle's attempt to impeach the victim's credibility by her inability to recall the exact date on which the sexual assault occurred and her failure to describe all the circumstances of the assault when she initially reported it.

The expert further testified about the types of behavior exhibited by child sexual abuse victims, i.e., that they can exhibit anger, confusion, depression, and lack of self-esteem, that they may become promiscuous, disrespectful and disobedient, and that they may abuse drugs or alcohol. The victim in this case had become more withdrawn following the assault, she became more modest in her attire, she became more hostile and she spent more time in her room which she kept dark by putting blankets over the curtains.

training, *and* experience. *Id.* Moreover, the qualification of an expert witness is a matter within the sound discretion of the trial court. *Commonwealth v. Bennett,* 471 Pa. 419, 370 A.2d 373 (1977). The expert witness herein, based upon her background, training and extensive experience working with the victims of child sexual abuse, was clearly qualified to state what she had observed regarding the behavioral characteristics of such victims, and the trial court did not err in qualifying her as an expert witness. Appellant's Brief and Reproduced Record at 46a–65a.

Dunkle sought to prove that the victim had always been a hostile and difficult adolescent and introduced evidence tending to show that the victim's behavior had not changed following the assault. The expert's testimony merely provided support, based upon the behavior of other child sexual abuse victims, for the prosecution's contention that it would not be unusual for the complaining witness to exhibit changed behavior following a sexual assault. The expert did not testify that child sexual abuse victims are credible, that this victim was credible, or that this victim exhibited the same behavioral characteristics as other known victims of child sexual abuse.

The trial court cited *Commonwealth v. Baldwin*, 348 Pa.Super. 368, 502 A.2d 253 (1985) (expert testimony that goes to the general behavioral characteristics of the victims of sexual abuse held to be admissible), to support its determination that the expert testimony was admissible and did not usurp the credibility determining function of the jury. This Court has several times considered the issue of the admissibility of expert testimony in child sexual abuse cases. In *Commonwealth v. Seese*, 512 Pa. 439, 441, 517 A.2d 920, 921 (1986), we held that a pediatrician's testimony that pre-pubertal children "do not lie" about sexual abuse was inadmissible because it encroached upon the jurors' credibility determining role by passing upon the credibility of a class of victims of which a witness in the case was a member.

In *Commonwealth v. Davis*, 518 Pa. 77, 80, 541 A.2d 315, 316 (1988), we held that a clinical child psychologist's testimony that "children who have not been involved in sexual experiences typically do not fantasize about sexual experiences," was inadmissible for the same reason, i.e., that the phenomenon of lying is within the capacity of jurors to assess, and such expert testimony would encourage jurors to defer to the expert assessment of the truthfulness of a class of people of which the witness was a member. In *Davis*, this Court disapproved *Commonwealth v. Baldwin, supra*, "insofar as it conflicts" with *Commonwealth v.*

*Seese, supra,* and *Davis. Commonwealth v. Davis,* 518 Pa. at 81 n. 1, 541 A.2d at 317 n. 1. In *Baldwin,* as in the case presently before the Court, the expert testimony went to the psychological dynamics of incest and the behavioral patterns of incest victims. The expert in *Baldwin* did not testify about the veracity of the victims of sexual abuse or the veracity of the complaining witness in the case, nor did the expert testify that the complaining witness was a victim of sexual abuse. In *Davis* we did not overrule *Baldwin.* The expert testimony in *Davis* and in *Seese* specifically involved statements about the propensity of sexual abuse victims to tell the truth. The court in *Baldwin* did not have before it such expert testimony. Thus, there is no statement in the *Baldwin* case which precludes such testimony. The only limitation noted is that the expert may not express an opinion regarding the credibility of the complaining witness. This Court in *Davis,* recognized that *Baldwin* could and might be construed to permit the type of expert testimony that was presented in *Seese* and *Davis;* hence, our limited disapproval of *Baldwin.*

In *Commonwealth v. Rounds,* 518 Pa. 204, 207 n. 4, 542 A.2d 997, 998 n. 4 (1988), we noted in dictum that a pediatrician's testimony that the victim in the case was not lying about sexual abuse was "patently inadmissible." Most recently, this Court, in *Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355 (1988), held that the testimony of a psychiatric nurse that the victim in the case was suffering from rape trauma syndrome and, as such, could have identified the perpetrator years after the attack in spite of having failed to do so immediately after the attack, was inadmissible as encroaching upon the credibility determining function of the jury. It is clear in all of these cases that the experts were making a direct and express "expert" assessment of witness credibility, thereby impermissibly usurping the function of the jury.

The disputed expert testimony in the instant case, however, involved observed traits that commonly appear in child sexual abuse victims, but that would not be a matter of

common knowledge to the average juror.[3] The expert witness did not act as a human lie detector who gave the stamp of scientific legitimacy to the truth of the victim's factual testimony. The expert witness did not testify that Dunkle sexually abused the victim at a specific time or place or that the expert believed the victim's claim. The testimony of the expert provided a background against which the jury could assess the behavior of the victim. In this respect, the expert testimony regarding the actual behavior of other sexual abuse victims was of help to the jury in assisting them to understand possibly unfamiliar reactions.[4]

In *Commonwealth v. Lane*, 521 Pa. 390, 397–98, 555 A.2d 1246, 1250 (1989), this Court stated:

3. Expert testimony is admitted to aid a jury when the subject matter of the testimony is related to a science, skill or occupation beyond the knowledge or experience of the average layperson. *Commonwealth v. Duffey*, 519 Pa. 348, 548 A.2d 1178 (1988). The average juror, who has had *no* experience observing child sexual abuse victims, knows little if anything about the psychological dynamics of intrafamilial sexual abuse and the behavioral characteristics of child sexual abuse victims.

4. The majority herein challenges the testimony relating to the general behavioral characteristics of the victims of child sexual abuse on the basis of the *"Frye"* standard, which was first set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Maj. op. at 832. This standard has been rejected as suffering from "serious flaws" in *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir.1985), particularly as it relates to the admissibility of novel scientific evidence. The standard from *United States v. Downing*, now known as the *Downing* standard, focuses on the scientific methodology used in generating the evidence to determine if it can be accepted as reliable by the court even if the evidence has not received widespread acceptance in the relevant scientific community. *See Rubanick v. Witco Chemical Corp.*, 125 N.J. 421, 593 A.2d 733 (1991); *see also Commonwealth v. Garcia*, 403 Pa.Super. 280, 307–08, 588 A.2d 951, 964–65 (1991) (Ford Elliott, J., dissenting, joined by Del Sole, J., and Hudock, JJ.) (urging case by case review rather than the establishment of blanket prohibitions on such evidence so as not to "abandon the child in the courtroom"). Clearly, in the case sub judice, the scientific methodology employed in gathering information about the behavioral characteristics of the victims of child sexual abuse was beyond reproach as the expert witness testified to behavioral characteristics she had personally observed in over 500 such victims. Although the so-called "laundry list" of characteristics may not be sufficiently specific to the victims of child sexual abuse to satisfy the majority herein, no one has disputed the fact that these characteristics *do* exist and *have* been observed in such victims.

Unquestionably, a prompt complaint is a factor which must be assessed with all of the other pertinent evidence bearing upon the question of the credibility of the complaining witness. In such cases the question of the sincerity of the complaint is raised if it is established that the delay under all of the factors present was either unreasonable or unexplained. Therefore, the inference of insincerity is only justified where the facts of the case fail to disclose a reasonable explanation for the challenged time lapse prior to the complaint.

(citations omitted). In the absence of the expert's testimony, the jury in the instant case would not have known that insincerity is *not* the only possible explanation for the delay of a child sexual abuse victim in reporting a sexual assault.

The standard jury instructions on witness credibility invite the jury to consider the following factors when judging credibility:

(a) Was the witness able to see, hear or know the things about which he testified?

(b) How well could the witness remember and describe the things about which he testified?

[ (c) Was the ability of the witness to see, hear, know, remember or describe those things affected by youth or old age or by any physical, mental or intellectual deficiency?]

(d) Did the witness testify in a convincing manner? (How did he look, act and speak while testifying? Was his testimony uncertain, confused, self-contradictory or evasive?)

(e) Did the witness have any interest in the outcome of the case, bias, prejudice or other motive that might affect his testimony?

(f) How well does the testimony of the witness square with the other evidence in the case, including the testimony of other witnesses? (Was it contradicted or supported by the other testimony and evidence? Does it make sense?)

Pennsylvania Suggested Standard Criminal Jury Instructions § 4.17(1)(a)–(f) (material in brackets is optional).

To the extent that a complaining witness may not recall certain details of a sexual assault, may not give complete details about the incident, and may delay reporting the incident, the jury will, on the basis of the standard jury instruction regarding credibility, be inclined to disbelieve that complaining witness's testimony, in the absence of any evidence that such behavior can be explained.

The expert testimony presented, although *bearing* upon the complaining witness's credibility, did not improperly enhance this witness's credibility in that it did not directly address her credibility or the credibility of sexual abuse victims in general. As cogently observed by Superior Court in *Commonwealth v. Pearsall*, 368 Pa.Super. 327, 331 n. 1, 534 A.2d 106, 108–09 n. 1 (1987), *allocatur denied*, 524 Pa. 596, 568 A.2d 1246 (1989):

> [T]here is a fundamental distinction between expert testimony which supports the credibility of a witness inferentially by establishing that a witness' testimony is *consistent* with the acts and responses evidenced in known child abuse cases, and expert testimony which presumes to pass directly upon the *veracity* of a particular witness.

(emphasis in original). The jury herein had to decide whether this victim's behavioral changes, inability to recall dates and times, failure to make a prompt complaint and omission of details resulted from sexual abuse or were due to other reasons. The expert's testimony would assist the jury in its truth-seeking function (the same as the aforementioned jury instructions assist the jury in its truth-seeking function), but inasmuch as it did not "pass directly upon the veracity" of the victim, I believe that the trial court's decision to admit this testimony was not "manifestly unreasonable," and did not constitute an abuse of discretion.

With regard to the issue raised by Dunkle, i.e., whether Dunkle waived consideration of the trial court's admission of evidence regarding prior misconduct involving the victim, the victim testified over Dunkle's objection that prior to

November, 1982, Dunkle would always go into his bedroom when she took showers and, by moving a panel in his closet, would peek at her while she showered. An experiment set up by the victim and her mother resulted in the victim's mother observing Dunkle kneeling in the closet at the movable panel and watching the victim as she showered. The victim further testified that on one occasion in November of 1982, Dunkle came into her bedroom at night and fondled her breasts while she pretended to be asleep. Dunkle objected to this testimony on the ground that 1) testimony about prior sexual acts involving a victim and defendant is permissible only where incest is alleged; 2) the prior acts were substantially different from the acts with which Dunkle had been charged; and 3) the probative value of the evidence was clearly outweighed by the prejudice to Dunkle. Notes of Testimony at 46–47 (Mar. 24–27, 1987).

This disputed testimony was not objected to on the grounds that the prior misconduct was too remote in time and did not constitute a continuous course of conduct on the part of the cross-appellant. Superior Court, however, addressed the issue of the admissibility of the testimony about prior sexual acts, in spite of finding that it had been waived on the grounds alleged in Dunkle's appeal, and ruled that this testimony would not be admissible at Dunkle's retrial on the basis that "the isolated occurrences of prior misconduct testified to by the victim simply do not constitute 'a series of acts indicating continuousness of sexual intercourse.' " 385 Pa.Super. at 323, 561 A.2d at 8. Dunkle argues that his objection to the testimony at trial was sufficient to apprise the Commonwealth and the trial court of the issues raised by the objection. In *Commonwealth v. Raymond,* 412 Pa. 194, 202, 194 A.2d 150, 154 (1963), *cert. denied,* 377 U.S. 999, 84 S.Ct. 1930, 12 L.Ed.2d 1049 (1964), this Court stated that "if the ground upon which an objection to testimony is based is specifically stated, all other reasons for exclusion are waived." As Dunkle did not challenge the testimony on the grounds that the prior misconduct was too remote in time and did not constitute a

continuous course of conduct on the part of Dunkle, I would find that this issue was waived.

Even if Dunkle had not waived the issue, I agree with the majority that the testimony regarding prior misconduct is admissible upon retrial.

Accordingly, I would reverse the order of the Superior Court reversing the judgment of sentence and remanding for a new trial, and I would reinstate the order of the Court of Common Pleas of Lycoming County entering the judgment of sentence.

This dissenting opinion is joined by PAPADAKOS, J.