718 A.2d 768

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Franklin D. CRAWFORD, Appellee.**

Supreme Court of Pennsylvania.

Submitted Sept. 18, 1997.

Decided Sept. 30, 1998.

Bradley K. Hellein, Greensburgh, George R. Kepple, Kittanning, for Com.

Preston Younkins, for Franklin D. Crawford.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

ZAPPALA, Justice.

This is an appeal by the Commonwealth from the Superior Court's order reversing the judgment of sentence imposed on Franklin D. Crawford and remanding the case for a new trial. Crawford was convicted by a jury of second degree murder arising from the death of Pearl Altman in October of 1971. The Superior Court determined that the trial judge had erred in excluding expert testimony of a psychiatrist regarding repressed memory sought to be introduced by defense coun-

sel. Under the circumstances of this case, we find that the expert testimony was inadmissible and reverse.

The body of Pearl Altman was found in the Allegheny River below a dam and adjacent to the Kittanning Park on Saturday, October 22, 1971. An autopsy performed by the Allegheny County Coroner's Office indicated that the cause of Altman's death was drowning and that Altman had sustained head injuries, multiple contusions and abrasions. No arrest was made in connection with the death until John Reed contacted the police more than twenty years later to report that he had witnessed the events leading to the drowning. Reed identified Franklin Crawford as the individual who was responsible for Altman's death. Crawford was subsequently arrested and charged with multiple offenses in connection with the homicide.

Prior to trial, defense counsel requested that Reed be required to submit to a psychological examination by a psychiatrist chosen by the defense. On January 10, 1995, the trial court granted the request and entered an order directing Reed to make himself available for a psychological examination. Dr. Jonathan Himmelhoch, the psychiatrist chosen by defense counsel, interviewed Reed on February 3, 1995.

Dr. Himmelhoch submitted a written report, which summarized Reed's recollection of the events in October of 1971, as follows:

Mr. Reed claims he had experienced the return of repressed memories of a Mr. Frank Crawford throwing the body of a Pearl May Altman into the Allegheny River in October of 1971, when he was about 18 years old. He also claims to remember seeing the whites of Ms. Altman's eyes as she rested in the arms of Mr. Crawford just before he cast her into the river. He assumed she was either dying or dead at that moment. The trigger to this "flashback" is alleged by Mr. Reed to have occurred near an IGA market in Leechburg, Pennsylvania, when he saw a woman who [sic] appearance was exactly the same as Pearl May Altman's. ...
[M]y history, which was taken in great detail, estimates this

delay began between 1989 and 1991 or between 3 and 5 years previously. During this time Mr. Reed describes a number of dream-like phenomena that reaffirmed to him the truth of his experience of seeing Ms. Altman in the process of being murdered in October 1971. For the most part, these phenomena consisted of hallucinatory visions or voices where Pearl May urged Mr. Reed that he must tell the truth and reveal his long suppressed knowledge and thereby obtain justice for her murder by Frank Crawford. Mr. Reed told me during and after his flashbacks and his visualizations of Pearl May he became quite emotionally upset, each time asserting that he was certain Frank Crawford had done what he had come to remember these past 1 1/2 to 5 years.

In his report, Dr. Himmelhoch stated that it was his opinion that the repressed memories of Reed could not be considered accurate to any degree approaching that which would obviate reasonable doubt. He further stated:

In summary, even though John George Reed is a likeable person who is intrinsically not mendacious – the internal workings of his memory, mind, intelligence and personality fit exactly that type of person who would recall a mistaken screen memory of violence and of terror. It cannot be emphasized enough that, not only is Mr. Reed likely to be wrong but his memory inaccurate and his hallucination of Pearl May decidedly pathological. Moreover, the large majority of repressed memories occurring more than 10 years from a single, acute event are usually wrong. It is my opinion to a high degree of medical certainty that Mr. Reed's return of the repressed should not be used as evidence of murder, because there is more than reasonable doubt this it [sic] is wrong.

Dr. Himmelhoch outlined several factors that he indicated should be considered in distinguishing the revival of repressed memories from what he referred to as "psychiatric confabulations, hysterical phenomena, outright hallucinations and/or frank manipulations or lies." In summary, Dr. Himmelhoch's analysis was guided by his statements that

1) the truthfulness of the memory is in direct proportion to the ability of the person to remember it accurately and in detail;

2) the presence of a history of alcohol and/or drug abuse significantly detracts from reliability and adds the possibility of chemically induced memories;

3) repressed memories always exact a psychological price in terms of interval psychopathology;

4) all the verified cases of long-term repressed memories are associated with massive, longer term psychic trauma such as the Holocaust, the Buffalo Creek Dam Disaster, or the Bataan Death March;

5) the presence of learning disabilities and/or a low I.Q. strongly decreases the likelihood that the returned, repressed memories are accurate; and

6) character structures that are simple and impressionable are much more likely to serve as a basis for a person to become entangled in triggered ideas and elaborate them extensively.

Dr. Himmelhoch concluded that Reed had a borderline I.Q.; that Reed had not experienced a significant psychiatric symptom during the prolonged period after Altman's death; and that Reed had abused alcohol and taken psychedelic drugs to a level that would not only disturb his memory, but could also stir up hallucinatory activity once he became convinced of a mistaken belief. In his opinion, Reed's memory was inaccurate and likely to be wrong.

Defense counsel filed a motion in limine seeking a ruling on the admissibility of Dr. Himmelhoch's testimony. In a pretrial conference with the trial judge, defense counsel asked that Dr. Himmelhoch's report be treated as an offer of proof as to what the psychiatrist would testify to if called as a witness. The Commonwealth objected to the expert testimony, asserting that it would invade the province of the jury to determine the credibility of a witness. Defense counsel conceded that Dr. Himmelhoch's opinion as to Reed's credibility was inadmissible, but argued that portions of his report ad-

dressed matters that were not within the common knowledge of the jury. The trial judge ruled that the proffered testimony went to the credibility of the witness and as such was inadmissible.

At trial, the Commonwealth introduced the testimony of Officer Donald Carley, who was previously employed as a patrolman for Kittanning Borough from 1968 to 1978. Officer Carley testified that he had seen Altman outside of a local bar between 11:00 p.m. and midnight on Friday, October 21, 1971, while he was patrolling in a police car. He testified that Altman was with Crawford at that time.

John Reed, who was 17 years old when these events occurred, testified that he saw Altman and Crawford sitting on a park bench beside a bridge by the Allegheny River on an evening late in October of 1971. The bridge was located on Market Street, the same street on which Officer Carley had seen the two of them. Reed knew Altman because he used to live across the street from her; he also knew Crawford through his association with Crawford's brother.

Reed approached them to ask for a cigarette, which Altman gave to him. He testified that Altman said that she was afraid of Crawford, and that he reassured her that she did not have to fear Crawford, whose family he knew. Reed testified that she calmed down, but then Crawford jumped up and told him, "If she don't give me what I want, I'm going to kill the bitch." Reed thought the threat was not genuine.

Altman and Crawford left before Reed finished his cigarette, walking together towards a flood control dam on the river. Reed followed them to borrow another cigarette. The next time Reed saw them, Altman was seated with her back against a concrete wall with her legs sticking straight out. He noticed that her eyes were "real big." Crawford, who was sitting or squatting by Altman, jumped up when Reed approached. Reed testified that he ran from the park, but turned to look back. When he looked back, Reed saw Crawford throw Altman into the water.

Reed indicated that he did not have a good relationship with the Kittanning police because he had stolen cars and tools, drank, and got involved in fights. He testified that he kept saying to himself that nobody was going to believe him and that they were going to blame him for it because he was always in trouble downtown.

Reed did not talk to anyone about that evening until twenty years later. He claimed never to have thought about what happened, stating, "I didn't even know it existed," and "I just thought it never happened." Reed further testified that in 1990 or 1991, he and his wife were at a grocery store when he noticed a girl in the parking lot whom he told his wife he knew. Reed told her the girl was "a Cravener girl," meaning Pearl. His wife informed him that she knew the girl and that she was someone else.

Reed also testified that he remembered waking up one night and seeing what appeared to be a mist. He heard a voice saying, "John you know what happened. Please tell." Reed told his wife about his memory of the events, and subsequently spoke to a police officer who referred him to State Police Officer James Dreyer. He then gave a statement to Officer Dreyer.

The Commonwealth also introduced the testimony of Crawford's former wife, Peggy Crawford. Mrs. Crawford testified that they were married in 1967 and were divorced in 1973. At the time of the incident, the Crawfords lived on a street which ran parallel to North Water Street. Mrs. Crawford stated that, on the Friday evening when Altman drowned, her husband had come home late, changed his clothes, put them in the washer, and told her that if anybody came looking for him that she did not see him. Her husband did not stay long, but returned later that night. She commented that it was not typical for Crawford to wash his clothes.

The jury convicted Crawford of second degree murder.[1] Crawford was sentenced to an imprisonment term of 10 to 20

1. The Penal Code, which was in effect in 1971 when the crime occurred, classified the offense as second degree murder. Under the

years. Post-sentencing motions filed by Crawford were denied.

The Superior Court reversed, finding that the trial judge erred in excluding the testimony of Dr. Himmelhoch. The court reasoned that the testimony was admissible because the phenomenon of repressed memory revived would not be within the ordinary training, knowledge, intelligence and experience of the average juror. The court concluded that since the trial judge admitted Reed's testimony about his revived repressed memory, it was error to exclude Dr. Himmelhoch's testimony regarding the reliability of revived repressed memories.

The Commonwealth asserts that the expert testimony was inadmissible because its purpose was to challenge the credibility of the witness. We find that the trial judge did not err in excluding expert testimony regarding revived repressed memories in this case.

 The admissibility of evidence is a matter entrusted to the discretion of the trial judge, and such ruling will not be disturbed on appeal unless an abuse of discretion is shown. *Commonwealth v. Boyle,* 498 Pa. 486, 447 A.2d 250 (1982). Expert opinion testimony is proper only where formation of an opinion on a subject requires knowledge, information, or skill beyond what is possessed by the ordinary juror. *Commonwealth v. Seese,* 512 Pa. 439, 517 A.2d 920 (1986).

 The determination of the credibility of a witness is within the exclusive province of the jury.

The question of whether a particular witness is testifying in a truthful manner is one that must be answered in reliance upon references drawn from the ordinary experiences of life and common knowledge as to the natural tendencies of human nature, as well as upon observations of the demeanor and character of the witness. The phenomenon of lying, and situations in which prevarications might be expected to

present statutory provisions of the Crimes Code, the offense would be classified as third degree murder.

occur, have traditionally been regarded as within the ordinary facility of jurors to assess.

*Seese,* 512 Pa. at 443, 517 A.2d at 922 (citations omitted).

█ "It is an encroachment upon the province of the jury to permit admission of expert testimony on the issue of the credibility of a witness." *Id.* "Whether the expert's opinion is offered to attack or to enhance, it assumes the same impact – an 'unwarranted appearance of authority in the subject of credibility which is within the facility of the ordinary juror to assess.'" *Commonwealth v. Spence,* 534 Pa. 233, 245, 627 A.2d 1176, 1182 (1993) (citation omitted).

In *Seese,* expert testimony of a pediatrician was introduced by the Commonwealth to demonstrate the veracity of young children who complain of sexual abuse. The pediatrician testified that, based upon her experience, young children usually do not fabricate stories of sexual abuse because they do not have sexual knowledge sufficient to supply details regarding sexual encounters. We concluded that it was error to admit expert testimony as to the credibility of children of an age similar to the complainant.

Such testimony, admitted as evidence, would encourage jurors to shift their focus from determining the credibility of the particular witness who testified at trial, allowing them instead to defer to the so-called "expert" assessment of the truthfulness of the class of people of which the particular witness is a member.

512 Pa. at 444, 517 A.2d at 922.

We held in *Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355 (1988), that expert testimony regarding the effects of rape trauma syndrome on a victim was inadmissible to bolster the victim's credibility. The Commonwealth introduced expert testimony to explain the rape victim's repeated failures to identify the defendant as her attacker within weeks of the assault. The expert witness identified the symptomatology of rape trauma syndrome, which was accepted as a standard post-traumatic stress response disorder by the American Psychiatric Association. The expert witness offered her diagnosis

that the victim suffered from rape trauma syndrome and expressed her opinion as to the impact of the syndrome on the identification process. We determined that the expert testimony was inadmissible because its only purpose was to enhance the credibility of the victim. "Such testimony would invest the opinions of experts with an unwarranted appearance of authority on the subject of credibility, which is within the facility of the ordinary juror to assess." 519 Pa. at 297, 547 A.2d at 358 (footnote omitted).

In *Commonwealth v. Dunkle*, 529 Pa. 168, 602 A.2d 830 (1992), we held that expert testimony about behavior exhibited by children who have been sexually abused was inadmissible to explain why sexually abused children may not recall details of the assault, to explain why they may not give complete details, and to explain why they may delay reporting the incident. We concluded that these matters went to the credibility of the child who was the victim of sexual abuse, and that permitting expert testimony to bolster the child's credibility would improperly interfere with the jury's function. We found that there was no clear need for an expert to explain why children fail to provide a detailed description of the abuse when such understanding was well within the common knowledge of jurors.

■ The expert testimony offered by defense counsel in this case was intended to establish that John Reed was not a credible witness. Dr. Himmelhoch's adamant assertion, that Reed's memories of the events leading to Altman's death could not be considered accurate to any degree which would obviate reasonable doubt, was inadmissible as an assessment of Reed's credibility. The jurors were eminently capable of assessing the credibility of the witness, a matter not within the domain of expert witnesses.

■ Crawford argues, however, that Dr. Himmelhoch's testimony was necessary to explain the phenomenon of revived repressed memory. His argument has no merit because the record demonstrates that revived repressed memory was not truly at issue in this case. While it is true that Reed offered an explanation for his inordinate delay in reporting what he

had observed that suggested revival of repressed memory, and the presence of apparitions urging him to come forward, the Commonwealth did not seek to establish that his explanation was scientifically supported by the phenomenon of revived repressed memory.

No expert testimony was offered by the Commonwealth to explain that revived repressed memory was recognized by the scientific community.[2] The Commonwealth did not attempt to prove that Reed had suffered from memory loss as a result of the trauma of observing the incident, or that any lost memory had been in fact revived. Not only did the Commonwealth fail to introduce evidence to persuade the jury that Reed's proffered explanation was believable, the prosecutor's closing argument conceded that Reed's explanation strained credulity.

> It's for you to determine, but you cannot shirk your duty simply by, we argue to you, simply by saying well, Mr. Reed is so unusual we can't do that. Not simply by doing that, by reaching that conclusion can you disregard what he said because of other evidence. * * * There is John Reed and I'll tell you, ladies and gentlemen of the jury, that the Judge is going to give you a specific instruction that you may disregard entirely the testimony of a person who you think has come in here and intentionally lied to you, but you are not required to do so and that you have the power even though you may believe that a person has come in and deliberately lied to you [sic] may choose to believe that witness as to some other event or some other fact that's an issue in this case.

> I submit to you that Mr. Reed is worthy of your belief. Although it's unusual and may be just his dramatic way of telling you that his conscious [sic] finally got the better of him.

R. 208–209.

The jury was capable of assessing Reed's credibility without the expert testimony regarding revived repressed memory.

---

**2.** We do not address whether expert testimony regarding revived repressed memory would be admissible into evidence under the standard articulated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

The Superior Court erred in concluding that Dr. Himmel-hoch's testimony was admissible to explain the phenomenon when the Commonwealth did not introduce expert testimony of the phenomenon, or argue to the jury that Reed's memory had been revived when he observed a girl resembling the victim in a parking lot. The reliability of revived repressed memory was never an issue that needed to be resolved by the jury. The assessment of Reed's credibility, which was at issue, was properly left to the jury.

The order of the Superior Court is reversed and the judgment of sentence is reinstated.