**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Matthew BORMACK, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 4, 2002.

Filed June 16, 2003.

Burton A. Rose, Philadelphia, for appellant.

Michelle P. Hutton, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before: JOYCE, BENDER and BECK, JJ.

BECK, J.

¶ 1 In this appeal we consider, *inter alia*, the admission of expert testimony regarding human memory and perception in the context of eyewitness identification. After careful analysis of the issues and the relevant case law, we affirm.

¶ 2 The evidence presented by the Commonwealth at trial revealed the following. Seventeen-year-old John Gallagher was an assistant manager at Eckerd Drugs in Drexel Hill, Delaware County. In August 2000 he was working at the store and engaged in emptying the cash register and an extra cash drop box. He walked from the front of the store to the back carrying the cash register drawer and locked the drawer in the office. He then returned to the front of the store to retrieve the money in the drop box. As he approached the register, he saw his co-worker Anna Vagnozzi and an apparent customer, whom he later identified as appellant.

¶ 3 Gallagher removed the cash from the drop box in view of Vagnozzi and appellant and started back to the office in the rear of the store. As Gallagher walked down the aisle toward the office, he heard running footsteps in the aisle next to him. When he reached the end of the aisle he was met by appellant, the customer he had seen at the front register. Appellant stood about one foot from Gallagher and had a kitchen knife in his hand. He instructed Gallagher to "drop it" and Gallagher handed him the money. Appellant then told Gallagher to "just stand there" to which Gallagher replied "take the money, just please don't hurt me."

¶ 4 Appellant took the money and fled from the store. Gallagher told Vagnozzi and the pharmacist on duty that he had been robbed, then called police. Gallagher described appellant as a white male, about 5' 10" tall, and wearing a tan baseball cap, a T-shirt, shorts and black shoes. Police described Gallagher's state as "shaken, [but] pretty much together." Approximately $790.00 was taken in the robbery.

¶ 5 Vagnozzi lent some corroboration to Gallagher's version of events. She explained that a white male customer was present at the register at the time Gallagher retrieved the money. When Gallagher walked away, the customer, whom Vagnozzi described as wearing a red short sleeved T-shirt, shorts and a cap, told her that he had forgotten something and left the register. Vagnozzi then heard some commotion in the aisle and thought perhaps it was Gallagher interacting with a friend. Thereafter, a person ran past her and out of the store. Vagnozzi could not identify appellant nor could she be certain that the person who ran past her was the customer she had seen earlier.

¶ 6 About three months later, Gallagher saw appellant exiting the drug store and promptly called police to report the sighting. Although he could not recall what appellant had been wearing, he noticed that appellant had facial hair (the start of sideburns and a moustache) that he had not had on the date of the robbery. Despite this change in appearance, appellant nonetheless was certain that the individual he saw on that date was the robber.

¶ 7 Three days later, Gallagher again saw appellant. This time appellant was washing his car on a street not far from the drug store; he did not have any facial hair. Again Gallagher called police and was able to show them the car appellant had been washing. Police asked Gallagher to view a photo array, from which Gallagher identified appellant. At a subsequent line-up, Gallagher once more identified appellant as the perpetrator. Finally, at tri-

al, Gallagher made a positive identification of appellant for the jury.

¶ 8 Appellant offered an alibi witness at trial, Jerry McKenna, who lives nearly an hour away from the drug store. McKenna testified that appellant arrived at McKenna's house at 4:30 or 5:00 PM on the day of the robbery and stayed there until 11:30 or midnight. The robbery occurred at 5:30 PM.

¶ 9 McKenna's wife also appeared on appellant's behalf. She testified that when she left for her bowling league game at 5:30 PM, appellant was at her home and when she returned at 8:30 PM he was still there. McKenna and his wife offered inconsistent testimony about several peripheral facts, such as when the couple began meeting with appellant on bowling nights and whether McKenna drank alcohol at these get-togethers.

¶ 10 The jury returned guilty verdicts on the charges of robbery and theft by unlawful taking. Appellant was sentenced and, following the denial of post-sentence motions, he filed this timely appeal.

¶ 11 Appellant's first issue on appeal is his claim that the trial court erred in denying him a new trial based on after-discovered evidence. On June 18, 2001, approximately ten months after the robbery in this case, and ten days after appellant was convicted, Gallagher signed a statement for Eckerd supervisors. In the statement, Gallagher admitted that in the previous six weeks he had taken money from the cash register when ringing up customers and had taken sodas and candy bars without paying for them. Gallagher admitted to taking approximately $165.00 in cash and merchandise over the six-week period.[1]

¶ 12 Appellant presented Gallagher's written statement at post-sentence motions and requested that a new trial be granted based on after-discovered evidence. The evidence, appellant claimed, would have been relevant to "suggest that John Gallagher himself might have stolen the money." Appellant's Brief at 8.

¶ 13 The grant of a new trial on the basis of after-discovered evidence is proper when the following conditions are met:

1. the evidence has been discovered after trial and could not have been obtained prior to the conclusion of trial by the exercise of due diligence;
2. the evidence is not merely corroborative or cumulative;
3. the evidence will not be used solely for impeachment purposes; and
4. the evidence is of such a nature and character that a different verdict will likely result if a new trial is granted.

*Commonwealth v. Cobbs*, 759 A.2d 932, 934 (Pa.Super.2000) (relying on *Commonwealth v. Valderrama*, 479 Pa. 500, 388 A.2d 1042 (1978)).

¶ 14 The trial court denied appellant a new trial because it found that the evidence proffered would be used solely to impeach Gallagher. We agree. Although appellant attempts to characterize the evidence as useful for purposes other than impeachment, his arguments make it clear that the evidence would be utilized solely for impeachment. He argues that the evidence could have established that Gallagher "falsified his account of the incident," and "may not have been truthful;" appellant claims that the evidence would have "apprised [the jurors of Gallagher's] character ... in order for them to properly

---

1. It appears that Gallagher stopped working at Eckerd after the robbery in the summer of 2000. He then resumed working at the drug store in May, 2001 and, in mid-June, signed the statement admitting theft.

assess the reliability and motive behind his testimony." Appellant's Brief at 9–12. Appellant adopts the statement made by trial counsel at the post-sentence hearing that the evidence "would have changed the Boy Scout into a criminal." *Id.* at 9.

¶ 15 All of these arguments establish that the value of the evidence was as impeachment evidence alone. Appellant has not suggested that the evidence would have prompted him to call other witnesses or offer other evidence, only that the evidence "would have allowed the jury to see Mr. Gallagher in a different light." Appellant's Reply Brief at 3. As such, the evidence is insufficient to satisfy the standard for a new trial. *See Valderrama, supra.*

¶ 16 In an effort to establish that the evidence does satisfy the applicable standard, appellant relies on *Cobbs, supra,* and *Commonwealth v. Fiore,* 780 A.2d 704 (Pa.Super.2001). In *Fiore,* the defense acquired a co-conspirator's statement after trial that exonerated the appellant. In *Cobbs,* police witnesses for the prosecution gave depositions in a civil case (after the criminal trial) that contradicted their trial testimony. In both instances, a new trial was granted.

¶ 17 The evidence here is unlike that in *Cobbs* and *Fiore.* It neither contradicts Gallagher's trial testimony nor does it exonerate appellant. While the evidence certainly establishes that Gallagher stole money, candy and soda from his employer some ten months after the robbery and during the period of time that the trial was taking place, it does not satisfy the standard for the grant of a new trial because its use is limited to impeachment of Gallagher. The trial court did not err in denying the request for a new trial on this basis.

■ ¶ 18 Appellant also asked the trial court to grant him a new trial based on trial counsel's alleged ineffectiveness in failing to request a jury instruction pursuant to *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (1954). To establish ineffectiveness, appellant must present a claim of arguable merit, assert a lack of strategy on counsel's part and establish that, but for counsel's act or omission, the verdict would have been different. *Commonwealth v. Scott,* 561 Pa. 617, 752 A.2d 871 (2000).[2]

¶ 19 A *Kloiber* instruction warns jurors that they should receive evidence of eyewitness identification with caution where:

> the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify [the] defendant on one or more prior occasions.

*Id.* at 424, 106 A.2d at 826–27.

■ ¶ 20 At the post-sentence hearing on this ineffectiveness claim, trial counsel testified that he did not believe a *Kloiber* instruction was warranted in this case. Counsel noted that Gallagher's initial observation of appellant was "in the store in the middle of the day with the lights on." Thereafter, Gallagher made additional identifications of appellant and contacted police each time. The trial court reasoned that the circumstances surrounding the robbery, coupled with the fact that Gallagher never equivocated on the identification, made it clear that a *Kloiber* charge

---

2. Although this is a direct appeal, the ineffective assistance of counsel issues raised by appellant were presented to the trial court and resolved after a hearing in that court. Thus, the Supreme Court's opinion in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), does not apply. We have an adequate record for review of appellant's ineffectiveness claims.

was neither necessary nor appropriate. We agree.

¶ 21 Appellant relies on *Commonwealth v. Simmons,* 436 Pa.Super. 203, 647 A.2d 568 (1994). In that case a panel of this court held that counsel was ineffective because he erroneously believed that a *Kloiber* charge was warranted only where a prior identification had been faulty. The *Simmons* court noted that the alternative basis for the charge, a witness who was not in a position to observe clearly, had been met in that case. Specifically, there was evidence that had the witness been standing at the location he claimed at the time of the crime, his view would have been obstructed by a railing or pole and a door. *Id.* at 569–570. *See also Commonwealth v. McKnight,* 307 Pa.Super. 213, 453 A.2d 1 (1982) (*Kloiber* instruction warranted where eyewitness saw perpetrators only from behind and at a distance of twenty feet).

¶ 22 With respect to Gallagher's ability to observe appellant during the crime, the evidence offered at trial revealed that Gallagher stood just a foot away from appellant as the robbery commenced. After handing over the money, Gallagher backed away from appellant, still looking at him. The entire scene took place in the aisle of the well-lit drug store. The evidence simply does not support a claim that Gallagher was not in a position to observe his assailant.

¶ 23 Appellant argues that Gallagher's claim of seeing appellant with facial hair after the crime (but before appellant's arrest) is the equivalent of a "failure of identification" because one of appellant's witnesses testified that she never saw appellant with facial hair. We cannot agree. *Kloiber* instructions are appropriate where an eyewitness is not positive of his identification or where that witness qualified his identification or failed to identify the defendant on one or more prior occasions. Gallagher testified that he was positive of appellant's identity as the robber; further, he was certain that he saw appellant both with and without facial hair during the three-month period between the crime and appellant's apprehension. There was no failure to identify and no lack of certainty on Gallagher's part. Thus, counsel was correct in determining that a *Kloiber* charge was unwarranted and the trial court properly found no ineffectiveness on this issue.

¶ 24 Appellant's final claim is that trial counsel was ineffective for failing to offer expert testimony in the field of human memory and perception. According to appellant, trial counsel should have consulted with and offered as a witness an expert on the unreliability of eyewitness identifications.

¶ 25 At the post-sentence hearing, appellant proffered the curriculum vitae and proposed testimony of Jonathan W. Schooler, Ph.D., an associate professor of Psychology at the University of Pittsburgh. Schooler set forth his opinions in a lengthy letter to counsel, which detailed the factors that influence the accuracy of eyewitness identification. Discussing extensive research regarding inaccurate identifications and their role in false convictions, Schooler's letter addressed the following areas of study:

1. "weapons focus," which indicates that the presence of a weapon can detract from a witness's ability to make an accurate identification;

2. "covering hair," which indicates that hiding or disguising portions of the face can have a major impact on the subsequent identification success;

3. "exposure duration," which indicates that brief exposure tends to be asso-

ciated with poorer recognition performance;

4. "overestimation of time," which indicates that people tend to overestimate the duration of events;

5. "delay," which suggests that identification accuracy usually declines with the passage of time;

6. "exposure to the suspect's face," which indicates that false identifications occur when a witness is exposed to faces in a photo array between the time of "encoding" (the crime) and test (the formal identification procedure); and

7. "relationship between confidence and accuracy," which attributes only a "modest" connection between the confidence a witness exhibits in the identification he has made and the accuracy of that identification.

Schooler Letter, dated 10/6/01.

¶ 26 Schooler's letter focused on extensive studies in cases where defendants were later exonerated using DNA evidence. According to Schooler, research and accompanying statistics establish that "eyewitness identification evidence is among the least reliable forms of evidence." *Id.* (citations omitted). Noting that the eyewitness identification of appellant in this case was the "critical source of evidence" upon which the conviction rested, Schooler suggested that expert testimony on the unreliability of such evidence was crucial.

¶ 27 At the post-sentence hearing, trial counsel testified that he was aware that experts espousing Schooler's opinions existed; however, counsel did not believe that such evidence was admissible in Pennsylvania. Specifically, counsel testified that he believed that the validity of any identification was a credibility determination left to the jury, making expert opinion on the issue inadmissible.

¶ 28 In arguing that counsel was not ineffective, the Commonwealth asserted that expert testimony of the type Schooler could have provided was indeed inadmissible in the Commonwealth. The trial court agreed and ultimately ruled that counsel was not ineffective because the evidence at issue was prohibited.

¶ 29 In *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621 (1995), our supreme court considered whether the trial court erred in precluding the defendant from offering expert testimony on the reliability of eyewitness identification. Not unlike the claim in this case, the appellant in *Simmons* proffered the expert testimony "to educate the jurors on possible factors that may affect a person's perception." *Id.* at 230, 662 A.2d at 630. But the *Simmons* court held that such testimony was improper as it would "intrude upon the jury's basic function of deciding credibility." *Id.* at 230, 662 A.2d at 631.

¶ 30 The *Simmons* court relied on a number of previously decided cases, all of which deemed inadmissible expert evidence that went to credibility. *See, e.g., Commonwealth v. Spence*, 534 Pa. 233, 245, 627 A.2d 1176, 1182 (1993) (expert testimony regarding stress and eyewitness identifications properly excluded); *Commonwealth v. Gallagher*, 519 Pa. 291, 547 A.2d 355 (1988) (precluding expert testimony to explain why a rape victim may fail to make a timely identification of her assailant); *Commonwealth v. Davis*, 518 Pa. 77, 541 A.2d 315 (1988) (prohibiting expert testimony that child sex abuse victims lack ability to fabricate).

¶ 31 There are additional cases in support of the notion that this type of expert testimony simply is not admissible in this Commonwealth. *See, e.g., Commonwealth v. Crawford*, 553 Pa. 195, 718 A.2d 768 (1998) (expert cannot testify that witness's

20–year–old memories cannot be accurate); *Commonwealth v. Dunkle,* 529 Pa. 168, 602 A.2d 830 (1992) (precluding expert testimony to explain child's delay in reporting sexual abuse); *Commonwealth v. Seese,* 512 Pa. 439, 517 A.2d 920 (1986) (precluding testimony of doctor who would comment on veracity of child sex abuse victims); *Commonwealth v. D.J.A.,* 800 A.2d 965 (Pa.Super.2002) (trial court need not have considered expert's testimony regarding why child/victim's statements were not trustworthy).

¶ 32 As a panel of this court has recognized, "the Pennsylvania Supreme Court has … been emphatic in holding that an expert may not testify as to the credibility of a witness's testimony." *D.J.A.,* 800 A.2d at 974 (citing *Dunkle,* 529 Pa. at 182–84, 602 A.2d at 837–38).

¶ 33 Despite this abundance of case law, appellant insists that the expert testimony at issue here is admissible. In an effort to distinguish *Simmons,* appellant notes that the evidence offered in that case was "general," whereas the evidence he proffered was specific to his case. Appellant directs our attention to a body of federal jurisprudence wherein such evidence has been deemed admissible based, in part, on its specificity.

¶ 34 The most recent case relied on by appellant is *United States v. Mathis,* 264 F.3d 321 (3d Cir.2001). In *Mathis,* the Third Circuit Court of Appeals considered whether the trial court erred in precluding the appellant's eyewitness identification expert. Appellant Mathis had been identified as one of three men who robbed a bank. One witness, Police Sergeant Gubbei, identified Mathis from a photo array after seeing him flee from the scene. Sergeant Gubbei testified that he saw Mathis exiting the getaway vehicle, a Jeep, while holding a gun. On cross-examination, the officer stated that despite the conditions surrounding his observation, he was "positive" appellant was one of the men in the Jeep.

¶ 35 At trial, Mathis sought to offer the testimony of an eyewitness identification expert who would have testified about a number of factors regarding memory and perception in the context of eyewitness identification. Those factors included "the confounding impact of 'double identification or post-event information (the effect of photo arrays),'" "the relationship between … confidence … [of] memories and accuracy of such memories," and "potential disruptions caused by 'weapons focus.'" *Id.* at 332. The *Mathis* court recognized that in order for the testimony to be admissible, it had to satisfy the "three distinct substantive restrictions on the admission of expert testimony in Federal Rule of Evidence 702: qualifications, reliability and fit." *Id.* at 335. Because neither the qualifications of the expert nor the reliability of his research were at issue, the *Mathis* court focused on whether the evidence at issue met Rule 702's "fit" requirement. To that end, the court considered whether the "expert's specialized knowledge would assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (relying on the precise language of Rule 702).

¶ 36 The *Mathis* court ultimately determined that there was a "fit" between the expert testimony offered and the evidence presented at trial. The court concluded that the circumstances surrounding the Sergeant's identification, *i.e.,* the perpetrator's possession of a weapon, the use of a photo array and the certainty with which Gubbei testified, made the expert testimony regarding those factors relevant and, therefore, a "fit" under Rule 702. *Id.* at

338.[3]

¶ 37 In reaching its conclusion that the expert testimony should have been admitted, the *Mathis* court relied on a prior case, published over fifteen years earlier. In *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985), appellant Downing argued that the district court erred in refusing to admit expert testimony on the unreliability of eyewitness identifications.[4] The *Downing* Court ruled that the district court may have erred because the evidence indeed satisfied the "helpfulness" test (or "fit requirement") of Rule 702. The *Downing* court remanded the matter to the district court for a hearing on whether the proffered expert evidence, as a novel form of scientific expertise, was admissible under Rule 702's reliability requirement, an analysis typically accomplished according to the standards set out in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).[5]

¶ 38 In holding that the expert testimony at issue was "helpful" or constituted a "fit" under Rule 702, the *Downing* Court observed that many other courts had reached contrary conclusions. *See Downing*, 753 F.2d at 1230. The *Mathis* Court

confirmed the divergence of views on the subject:

> In *Downing*, we discussed certain of the rationales advanced by other courts of appeals in prior years for excluding such testimony, including notions that relevant issues could adequately be raised through cross-examination and common sense, that such testimony usurps the jury's function, and that such evidence would lead to an unduly confusing "battle" of experts.... [W]e disavowed skepticism of such testimony as a matter of principle....

*Mathis*, 264 F.3d at 336.

¶ 39 The *Mathis* court's recognition of contrary case law could have included Pennsylvania's view. Like those circuit courts noted in *Mathis*, our Supreme Court has held that the type of expert testimony at issue in *Mathis* is inadmissible because it "intrudes upon the jury's basic function of deciding credibility." *Commonwealth v. Simmons*, 541 Pa. at 230, 662 A.2d at 631. While a particular circuit court within the federal system is free to reject the holding of another circuit

---

**3.** The *Mathis* court went on to determine that preclusion of the evidence constituted harmless error because there was other evidence linking Mathis to the crime, including testimony by one of his co-conspirators. *Mathis*, 264 F.3d at 343.

**4.** The expert in *Downing* would have offered testimony regarding:

(1) the "forgetting curve," *i.e.*, the fact that memory does not diminish at a uniform rate; (2) the fact that, contrary to common understanding, stress causes inaccuracy of perception and distorts one's subsequent recall; (3) the "assimilation factor," which indicates that witnesses frequently incorporate into their identifications inaccurate information gathered after the event and confused with the event; (4) the "feedback factor," which indicates that where identification wit-

nesses discuss the case with each other they can unconsciously reinforce their individual identifications; and (5) the fact that studies demonstrate the absence of a relationship between the confidence a witness has in his or her identification and the actual accuracy of that identification.

*Downing*, 753 F.2d at 1230.

**5.** The *Downing* Court recognized that the *Frye* test's general acceptance standard was problematic for this novel scientific research/theory. In remanding the matter, the court offered an alternative method of inquiry into Rule 702's reliability requirement. The *Downing* opinion was a precursor to the United States Supreme Court opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 n. 12, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (reliability "discussion draws in part" on *Downing* ).

court in its interpretation of a federal rule of evidence, we are not free to disregard the holdings of our state supreme court in its interpretation of our own rules of evidence. *Simmons*, the myriad cases upon which it was based, as well as those cases that have come after it, all are binding on us here.

¶ 40 *Mathis*, *Downing* and other cases addressing this issue are not binding on us. Thus, notwithstanding · appellant's claim that there is a "fit" between his expert and the evidence presented at trial, the fact remains that the courts of this Commonwealth have deemed such evidence inadmissible because it intrudes upon the jury's credibility determination. That concern, usurping the jury's function, is present regardless of any "fit" the evidence may satisfy. In sum, trial counsel was correct in concluding that expert testimony on the unreliability of eyewitness identification was inadmissible in Pennsylvania. Therefore, counsel was not ineffective for failing to offer such evidence.

¶ 41 Because our review leads us to conclude that appellant is not entitled to relief, we affirm.

¶ 42 Judgment of sentence affirmed.