Filed 4/17/15  P. v. Salazar CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH MANUEL SALAZAR,<br><br>    Defendant and Appellant. | H039968<br>(Santa Clara County<br>Super. Ct. No. C1094322) |

Defendant Joseph Manuel Salazar appeals from a judgment of conviction entered after a jury found him guilty of three counts of lewd touching of a child under 14 by force (Pen. Code, § 288, subd. (b)(1)).[1]  The trial court sentenced defendant to 11 years in state prison.  On appeal, defendant contends:  (1) child sexual abuse accommodation syndrome (CSAAS) evidence should be inadmissible for all purposes; (2) CALCRIM No. 1193 erroneously informs the jury that it may consider the CSAAS expert's testimony in determining the child witness's credibility; (3) CALCRIM No. 330 improperly bolstered the child witness's credibility; (4) the prosecutor committed misconduct; and (5) the cumulative effect of the errors requires reversal.  We affirm.

---

[1]     All further statutory references are to the Penal Code.

## I. Statement of Facts

### A. Prosecution Case

Audrey Doe was 10 years old when she testified. In December 2010, she was eight years old and in the third grade. Her mother is Elena A. Ms. A. is a school secretary at the same school that Audrey attends. During the 2010-2011 school year, Audrey went to day care, which was operated by Gloria Salazar, defendant's wife. Ms. A. would drop Audrey off at day care before school at 7:30 a.m. and pick her up after school between 4:00 p.m. and 4:15 p.m.

On the morning of December 7, 2010, Ms. A. was driving her son to school. Audrey was sitting in the back seat and she asked her mother if she had ever choked on water. Audrey stated that defendant "had hugged her from the back when she was drinking water and had squeezed her and the water came back up and choked her and made her cough and that it had gone in her nose." Audrey then said that "he's been touching me in my privates." Ms. A. asked Audrey what she meant by touching and why she had not told her before. Audrey replied that he had touched her like in a movie that the family had watched. Ms. A. explained that there was a scene in this movie where one person put his hand "on the other person's rear-end." Audrey stated that that was what defendant "had done to her, but she said in the front." According to Audrey, it happened more than twice, but she could not give a specific number. Audrey also said that it only happened when she was in third grade.

Ms. A. took Audrey to school and then contacted the police. Officer Catherine Alvarez interviewed Audrey that day at the school. Later that same day, Ms. A. took Audrey to the police station where she was interviewed by Officer Daniel Ichige. A video of the second interview was played for the jury. During this interview, Audrey stated that defendant "puts his hand sorta on [her] private." She explained that her "private" is the part of her body that she goes "to the bathroom with [¶] . . . [to] pee." Defendant touched her over her clothing, and when she tried to move away from him, he

2

pulled her back. She then pushed him off of her. Defendant touched her about 13 times. She thought defendant started touching her when she was in second grade.

About three weeks before Audrey told Ms. A. that defendant had inappropriately touched her, Ms. A. had noticed that Audrey was "very clingy." If Ms. A. went to the restroom, Audrey sat outside the door. During this period, Audrey did not sleep in her own bed, stayed with Ms. A. in the office during recess, did not want to play with her friends, was always concerned with where Ms. A. was, and started saying "on a daily basis" that she did not want to go to Ms. Salazar's anymore. When Ms. A. asked her why she did not want to go to day care, Audrey "just said she didn't want to go."

At trial, Audrey testified that when Ms. Salazar went to the bathroom, she left the children with defendant. Defendant touched her on her vagina or "private." She demonstrated how defendant grabbed her and pulled her toward him when she went from the play room to the kitchen to get a drink. He held "one hand around [her] shoulders and then one hand down" to touch her "private." While sitting on the couch in the living room, he cupped his hand and "sort of wav[ed] it" on her "private." When she tried to pull away from defendant, he would pull her back. She did not remember how many times that he did this. He also sometimes kissed her cheek. She remembered telling Officer Ichige that defendant touched her around 13 times. Defendant touched her "[a]bout once a day probably [¶] . . . for weeks" in the afternoon. She did not tell anyone because she did not know what it meant. However, when she watched the movie "Grownups," she "was like, 'Oh, that's what happened to me.'" She then told her mother the following day. According to Audrey, she told her mother when they were at home, not in the car.

Carl Lewis testified as an expert in CSAAS. Lewis was self-employed as a consultant and trainer on child abuse issues after a 25-year career in law enforcement. He did not conduct any investigation regarding the present case and he testified generally about CSAAS. He explained that Dr. Roland Summit, a psychiatrist, worked in clinics

3

that treated both victims of sexual abuse and their offenders. Based on his research and clinical observations, Dr. Summit first used the term CSAAS to describe the commonly-held misconceptions of child sexual abuse.

There are five categories of CSAAS: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, or unconvincing disclosure; and (5) retraction. Lewis explained that "secrecy describes the fact that the sexual abuse of a child occurs almost exclusively when the offender is alone or sometimes isolated with a child." "Entrapment and accommodation" is "[w]hen a child has been sexually abused and is carrying the burden of the secret, whether it be [] one-time or ongoing, the child is trapped by that circumstance. . . . [¶] Children . . . will find a way to accommodate and find a way to put up with that negative situation in their lives." Delayed disclosure refers to the "delay from the time of the abuse to the time the child is able to talk about it." Conflicted disclosure describes both the internal conflict that the child "might be going through and weighing the pros and cons of disclosure" and that "what a child says about a sexual abuse may appear to be in conflict with other things the child has said and a lot of that has to do with the questions that are asked, who is doing the asking." Unconvincing disclosure describes "that when a child finally does make a disclosure of sexual abuse, it's usually done in a way or at a time when the child seems unbelievable. The mere fact of the delay can make a child seem unbelievable and might prompt a response, [w]ell, if that had . . . really been happening, you would have said something earlier. But a child might be receiving discipline for some behavior, and in the course of being disciplined, the child might feel free to let go of the secret and say, [w]ell that's not as bad as what he's been doing to me."

Lewis also testified that Dr. Summit later became concerned about how CSAAS was being used in court. In 1992, Dr. Summit published an article in which he stated that attorneys were improperly attempting to show the presence or absence of sexual abuse

4

based on CSAAS. According to Dr. Summit, CSAAS was "intended to be used as information," and not as a diagnostic tool.

### B. Defense Case

Ms. Salazar testified that she is a day care provider for seven children in addition to Audrey. Ms. Salazar sat in a chair in the kitchen where she could watch the children in the play room as well as see into the living room. The children were not allowed to leave the play room unescorted. If they wanted water, they had to ask for it and drink it in the kitchen. When Ms. Salazar needed to use the restroom, her daughter or defendant would take her place and watch the children.

About three to four weeks prior to December 7, 2010, Audrey got into trouble for touching defendant's hair. Both Ms. Salazar and defendant told her to stop. She also hugged a baby too hard and made him cry. On other occasions, Audrey was placed in time out for stepping on children's fingers, taking toys from the smaller children, and bending one girl's fingers back.

Ms. Salazar never saw defendant grabbing or pushing any of the children. She never saw him grab Audrey or pull her onto his lap. Audrey never told her that she had been hurt by defendant. Audrey did not cry while at day care.

Mikayla Valdez, defendant's niece, was nine years old when she testified. She went to Salazar's day care in 2010. Defendant never touched her inappropriately and she never saw defendant grab or pull Audrey or touch her inappropriately.

Officer Ichige interviewed defendant. Defendant told him that when his wife was using the restroom, he watched the children for her. Defendant stated that Audrey was "always" hugging him and that both he and his wife told her to stay away. At one point in the interview, Officer Ichige asked, "[M]y guess of what happened is you just fucked up? Is that pretty much it?" Defendant responded, "[Y]eah, I guess it is." Officer Ichige asked him why he did that and he replied, "I don't know. It's probably all the pressure."

5

Officer Ichige asked "[W]hen did you first touch her?" Defendant said, "I don't remember" and then he said, "[Y]eah, well just lately, just lately and then before then." Officer Ichige asked, "[O]kay . . . about how long ago?" Defendant replied, "[M]aybe a month ago, if that." Defendant said that they were in the living room, Gloria was in the kitchen, and the other children were watching television. Defendant told Officer Ichige that he touched Audrey's chest and stomach. When asked why he had touched her, he said, "I don't know, I just did. I just -- it's something that happened right there, and I just did it." He said that he touched her twice. Defendant also said, "I won't have a family after they find out what's up." When Officer Ichige asked defendant again why he touched Audrey, he said "I just gave up. That's what I did. I gave up on life." Officer Ichige responded, "You just fucked up. Is that what you're saying?" Defendant said, "Well yeah, yeah. You know, of course." When Officer Ichige asked, "How did you fuck up?" Defendant responded, "Just by, you know, just by touching her at all." Defendant also said, "It should never have happened." At that point, defendant said that all he did was hug her. Defendant also denied touching Audrey's vagina multiple times.

Dr. A. Steven Frankel testified as an expert in the field of CSAAS and as a forensic psychologist in the area of child abuse. According to Dr. Frankel, Dr. Summit became concerned that his theory was being used to determine whether a child had been abused and he wrote an article in which he stated that he "never intended his work to be seen as science." Dr. Frankel explained that the behaviors described in CSAAS exist in children who have been abused and those who have not. Dr. Frankel also referred to various articles by professionals in the field of child sexual abuse who had conducted research that discredited CSAAS.

Defendant testified on his own behalf. He watched the children if Ms. Salazar was cooking. He sat on the chair in the kitchen. He did not discipline the children. Defendant never pulled Audrey over to him. On one occasion, he pushed her away after she grabbed his hair. Ms. Salazar once raised her voice at Audrey when she saw her on

6

defendant's lap. Defendant pushed her off, because there was a "no-hands-on rule" in the house. Defendant told Officer Ichige that he put his arm around Audrey and hugged her. He also kissed the children on top of their heads. One of the children kicked Audrey in the stomach, so defendant tried to comfort her by putting his arm around her stomach. Defendant touched her chest when he touched her stomach. He explained that he told Officer Ichige that he would not have a family after they found out what he had done, "because of the no touch policy, you know, you're not supposed to." Defendant denied touching Audrey's vagina.

## C. Rebuttal

Phyllis Go, Audrey's third grade teacher, testified that Audrey was not getting into trouble at school in October and November 2010. Audrey's overall behavior in class was very good.

## II. Discussion

## A. CSAAS Evidence

Defendant contends that CSAAS evidence should be inadmissible for all purposes in California, because "the evidence cannot possibly be limited to the description of myths surrounding abuse."

Prior to trial, the prosecution sought the admission of CSAAS evidence and the defense sought its exclusion. Following a hearing, the trial court ruled that CSAAS evidence was admissible.

The California Supreme Court has recognized that in cases of alleged child sexual abuse, "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or

7

her testimony claiming molestation.  [Citations.]  'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.  [¶]  The great majority of courts approve such expert rebuttal testimony.' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301, fn. omitted (*McAlpin*); see also *People v. Brown* (2004) 33 Cal.4th 892, 906.)

Defendant acknowledges that California courts have held that CSAAS evidence is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1383-1384 (*Gilbert*), superseded on other grounds by CALJIC No. 10.41, as recognized in *People v. Levesque* (1995) 35 Cal.App.4th 530, 536-537; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450 (*Harlan*); *People v. Stark* (1989) 213 Cal.App.3d 107, 116-117; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394.)  Relying on several out-of-state cases, defendant argues that the California cases need to be reexamined.  (See e.g., *State v. Stribley* (Iowa App. 1995) 532 N.W.2d 170, 174 [CSAAS not accepted in scientific community as means to detect abuse]; *Commonwealth v. Dunkle* (1992) 529 Pa. 168, 184-186 [testimony about uniformity of behaviors of abused children not sufficiently established to have gained general acceptance in its particular field]; *Bussey v. Commonwealth* (Ky. 1985) 697 S.W.2d 139, 141 [CSAAS evidence not proven to be a generally accepted medical concept or a syndrome that has attained scientific acceptance]; and *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557, 561-562 [CSAAS evidence not shown to be reliable and invades jury's province to determine credibility].)  We decline to do so.  To the extent our Supreme Court has recognized that such evidence may be relevant, useful, and admissible in a given case, as an intermediate appellate court, we are in no position to rule otherwise. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## B. CALCRIM No. 1193

Defendant next contends that CALCRIM No. 1193 erroneously informed the jury that it could consider the CSAAS expert's testimony in determining Audrey's credibility.[2] Defendant contends that the instruction "permits the jurors to consider this expert testimony as supportive of the truth of the allegations made against the defendant."

The trial court instructed the jury pursuant to CALCRIM No. 1193: "You have heard testimony from Carl Lewis regarding [CSAAS]. [¶] His testimony about the [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Audrey's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony. This does not alleviate the People's duty to find the defendant guilty beyond a reasonable doubt."

When we review a purportedly erroneous instruction, we consider " ' " " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).) We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*Ibid.*)

CALCRIM No. 1193 is a cautionary instruction that warns the jurors that they must not consider CSAAS testimony as evidence that the defendant committed the offense. It then informs the jury that it may use CSAAS evidence to evaluate whether the alleged victim's behavior which appeared inconsistent with being molested was actually

---

[2]     The Attorney General argues that defendant has forfeited this contention because he did not object to CALCRIM No. 1193. Section 1259 allows appellate review of claims of instructional error which affect the defendant's substantial rights. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7 (*Wallace*).) Accordingly, we will consider the merits of defendant's contention.

not inconsistent. To the extent that CALCRIM No. 1193 allows the jury to consider CSAAS evidence when it evaluates the alleged victim's credibility, such evidence is relevant and admissible when an alleged victim's credibility has been attacked. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.) Thus, in considering the instruction as a whole, it is not reasonably likely that the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS testimony for the improper purpose of proving that Audrey was in fact abused by defendant.

### C.  CALCRIM No. 330

Defendant contends that CALCRIM No. 330 improperly bolstered Audrey's credibility, thereby violating his state and federal constitutional rights to a jury trial, confrontation, due process, and the right to present a defense.

The trial court instructed the jury: "You have heard testimony from a child who is age 10 or younger. As with any other witness, you may decide whether the child gave truthful and accurate testimony. [¶] In evaluating the child's testimony, you should consider all of the factors surrounding that testimony, including the child's age and level of cognitive development. [¶] When you evaluate the child's cognitive development, consider the child's ability to perceive, understand, remember, and communicate. [¶] *While a child and an adult witness may behave* [*differently*], *the difference does not mean that anyone is more believable than the other.* You should not discount or distrust the testimony of a witness just because he or she is a child." (Italics added.)

Defendant argues that the italicized portion of "CALCRIM No. 330 precludes consideration of child witnesses' demeanor and difficulty in perceiving, understanding, remembering, or communicating as indications that their testimony lacks credibility." (Capitalization & boldface omitted.)

The Attorney General points out that defendant's arguments were rejected in *People v. Fernandez* (2013) 216 Cal.App.4th 540 (*Fernandez*). In *Fernandez*, the

defendant conceded that "his contentions have been uniformly rejected in published decisions rejecting the same argument with respect to CALJIC No. 2.20.1, the predecessor to CALCRIM No. 330. (*People v. McCoy* (2005) 133 Cal.App.4th 974, 979-980; *People v. Harlan* (1990) 222 Cal.App.3d 439, 455-457; *People v. Jones* (1992) 10 Cal.App.4th 1566, 1572-1574; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1393.)"[3] (*Fernandez*, at p. 559.) After summarizing these cases, *Fernandez* concluded: "CALCRIM No. 330 simply instructs the jury to take into account a child's ability to perceive, understand, remember and communicate when making a credibility determination. It does not instruct the jury to subject a child's testimony to a less rigorous credibility determination, nor does it excessively inflate a child witness's credibility." (*Fernandez*, at p. 560.)

As this court explained in *Gilbert*, *supra*, 5 Cal.App.4th 1372: "In *People v. Jones* (1990) 51 Cal.3d 294, the Supreme Court made clear that, far from 'unduly inflating' the child's testimony, [Penal Code] section 1127f [the statutory basis for CALJIC No. 2.20.1 and CALCRIM No. 330] 'adopted the modern view regarding the credibility of child witnesses . . . .' 'It is now well established that a child's testimony cannot be deemed insubstantial merely because of his or her youth. . . . [¶] Recent studies have undermined traditional notions regarding the unreliability of child witnesses, their untruthfulness, susceptibility to leading questions, or inability to recall prior events accurately. "Empirical studies have produced results indicating that most of these traditional

---

[3]     CALJIC No. 2.20.1 states: "In evaluating the testimony of a child [ten years of age or younger] you should consider all of the factors surrounding the child's testimony, including the age of the child and any evidence regarding the child's level of cognitive development. A child, because of age and level of cognitive development, may perform differently than an adult as a witness, but that does not mean that a child is any more or less believable than an adult. You should not discount or distrust the testimony of a child solely because he or she is a child. [¶] 'Cognitive' means the child's ability to perceive, to understand, to remember, and to communicate any matter about which the child has knowledge."

11

assumptions are completely unfounded." [Citations.]' [Citation.] The instruction tells the jury not to make its credibility determinations solely on the basis of the child's 'age and level of cognitive development,' but at the same time invites the jury to take these and all other factors surrounding the child's testimony into account. The instruction provides sound and rational guidance to the jury in assessing the credibility of a class of witnesses as to whom ' "traditional assumptions" ' may previously have biased the factfinding process. Obviously a criminal defendant is entitled to fairness, but just as obviously he or she cannot complain of an instruction the necessary effect of which is to increase the likelihood of a fair result." (*Gilbert*, at p. 1393.) Thus, *Gilbert* rejected the defendant's challenge to CALJIC No. 2.20.1 on the grounds that it denied him due process and equal protection. (*Ibid.*)

Conceding that his arguments have been rejected by other courts, defendant contends that *Harlan*, *supra*, 222 Cal.App.3d 439, *People v. Jones* (1992) 10 Cal.App.4th 1566, *Gilbert*, *supra*, 5 Cal.App.4th 1372, and *People v. McCoy* (2005) 133 Cal.App.4th 974 were wrongly decided. Defendant argues that CALCRIM No. 330 refers to "the child witness's behavior as being different from an adult's and suggests that jurors not consider a child witness's behavior, including her demeanor and manner of expression, in evaluating the child's perception, recollection and credibility. In effect, the instruction compels jurors to ignore their own experience interpreting children's non-verbal cues and behavior." Defendant also argues that "the term 'behavior' in CALCRIM No. 330 can most logically be understood as including the content of the child witness's testimony." Thus, he contends that "[b]y unfairly restricting the jury's consideration of factors pertinent to assessing Audrey's credibility, CALCRIM No. 330 violated [his]

12

constitutional rights to a jury trial, to present a defense, to confront witnesses and the general due process . . . ."[4]

As previously stated, we must determine " ' " " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*Richardson*, *supra*, 43 Cal.4th at p. 1028.) We disagree with defendant that this instruction suggests to the jury that it not consider the child witness's behavior in evaluating his or her testimony or that it improperly bolsters his or her credibility. When considered as a whole, CALCRIM No. 330 tells the jury to "consider all of the factors surrounding that testimony" and to "consider the child's ability to perceive, understand, remember, and communicate." The instruction acknowledges that a child and an adult may behave differently when testifying and cautions the jury not to make a credibility determination based solely on the child's age. There is nothing in the instruction prohibiting the jury from considering the child witness's demeanor in determining credibility. Thus, we reject defendant's arguments that CALCRIM No. 330 is unconstitutional.

Defendant's reliance on *People v. Dennis* (1998) 17 Cal.4th 468 (*Dennis*) is misplaced. In *Dennis*, the defendant argued that his counsel was ineffective for failing to request CALJIC No. 2.20.1. (*Id.* at p. 527.) The Attorney General contended that trial counsel could have made a reasonable tactical decision to forgo requesting the instruction. (*Ibid.*) Citing to *Jones*, *supra*, 10 Cal.App.4th at pp. 1572-1574, *Gilbert*, *supra*, 5 Cal.App.4th at pp. 1392-1394, and *Harlan*, *supra*, 222 Cal.App.3d at pp. 455-457, *Dennis* acknowledged that trial attorneys' repeated challenges to the instruction had

---

[4]    The Attorney General argues that defendant has forfeited this contention because he did not object to CALCRIM No. 330. However, section 1259 allows appellate review of claims of instructional error which affect the defendant's substantial rights (*Wallace*, *supra*, 44 Cal.4th at p. 1074, fn. 7), and thus we will consider the merits of defendant's contentions.

failed.  (*Dennis*, at p. 527.)  However, *Dennis* concluded that the attacks were not "were not so baseless and unreasonable as to render defense counsel's performance deficient for not requesting the instruction in this case."  (*Ibid.*)  *Dennis* did not hold that these cases were wrongly decided.

## D.  Prosecutorial Misconduct

During closing argument, the prosecutor stated:  "At this point you heard evidence.  *You no longer have to presume the defendant innocent.*  You may now, based on the evidence you heard if you believe it beyond a reasonable doubt, find him guilty.  I believe based on the evidence that you have heard that is the finding you will make."  (Italics added.)  Defendant contends that the italicized portion of the prosecutor's argument constituted misconduct.

As this court has observed:  " 'The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice.' (*Estelle v. Williams* (1976) 425 U.S. 501, 503.)  [Citation.] . . .  ' "This presumption," [the United States Supreme Court] has said, "is an instrument of proof created by the law in favor of one accused, whereby his innocence is established, until sufficient evidence is introduced to overcome the proof which the law has created." [Citation.]' (*Kirby v. United States* (1899) 174 U.S. 47, 55.)  Moreover, 'the presumption of innocence continues not only during the taking of the testimony, but during the deliberations of the jury and until they reach a verdict . . . .' (*People v. Arlington* (1900) 131 Cal. 231, 235.)"  (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1405-1406.)

" ' " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' " (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)  Under state law, a prosecutor's conduct may constitute misconduct if it involves " ' " " 'the use of deceptive or reprehensible methods to attempt to

14

persuade either the court or the jury.'"'"" (*Ibid.*) An appellate court reviews the prosecutor's comments to determine "whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Ibid.*) Though prosecutors have wide latitude in drawing inferences from the evidence presented at trial, it is misconduct to misstate the law. (*People v. Boyette* (2002) 29 Cal.4th 381, 435 (*Boyette*).)

However, in order to preserve a claim of prosecutorial misconduct on appeal, there must be a timely objection and a request for a curative admonition. (*Boyette*, *supra*, 29 Cal.4th at p. 432.) There are two exceptions to this general rule. "'A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if "'an admonition would not have cured the harm caused by the misconduct.'" [Citations.]'" (*Ibid.*) Here, as defendant acknowledges, defense counsel did not object. Defendant, however, does not argue that either exception to the forfeiture rule applies. Accordingly, defendant's claim has been forfeited.

Defendant also argues that he received ineffective assistance of counsel when trial counsel failed to object to the prosecutor's misstatement of the law. We disagree.

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.)

Relying on *People v. Goldberg* (1984) 161 Cal.App.3d 170 (*Goldberg*), the Attorney General argues that the prosecutor's comment did not constitute misconduct. In *Goldberg*, the prosecutor stated: "'And before this trial started, you were told there is a

15

presumption of innocence, and that is true, but once the evidence is complete, once you've heard this case, once the case has been proven to you—and that's the stage we're at now—the case has been proved to you beyond any reasonable doubt. I mean, it's overwhelming. *There is no more presumption of innocence.* Defendant Goldberg has been proven guilty by the evidence.'" (*Goldberg*, at p. 189.) *Goldberg* noted that the trial court instructed the jury regarding reasonable doubt and the prosecutor stated twice that the state had the burden of proving guilt beyond a reasonable doubt. (*Ibid.*) *Goldberg* rejected the defendant's claim of prosecutorial misconduct, reasoning: "Once an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they,* as the fact-finding body, conclude guilt was proven beyond a reasonable doubt." (*Goldberg*, at pp. 189-190.)

Defendant argues that *Goldberg* is distinguishable from the present case, because the prosecutor intimated that the presumption was over before the jury considered the evidence.

Here, prior to opening statements, the trial court instructed the jury: "Keep an open mind throughout the trial. Do not make up your mind about the verdict or any other issue until after you have discussed the case with your fellow judges during deliberations." The trial court also gave the following instruction: "A defendant in a criminal case is presumed to be innocent. The presumption requires that the People prove a defendant guilty beyond a reasonable doubt." Before counsel gave their closing arguments, the trial court instructed the jury: "You must follow the law as I explain it to you . . . . If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The trial court also instructed the jury again regarding the presumption of innocence. Though the prosecutor then stated that the jury "no longer [had] to presume the defendant innocent" during argument, he also stated that the jury "had heard the evidence" and "based on the evidence you heard if you

16

believe it beyond a reasonable doubt, find him guilty. I believe based on the evidence that you have heard that is the finding you will make." The prosecutor's statement regarding the presumption of evidence was somewhat ambiguous. Moreover, the trial court specifically instructed the jury that the presumption of innocence continued until the jury reached its verdict after it reviewed the evidence during deliberations. Under these circumstances, defense counsel could have reasonably concluded that it was not reasonably likely that "the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Samayoa*, *supra*, 15 Cal.4th at p. 841.) Thus, defense counsel did not render ineffective assistance by failing to object to the prosecutor's statements.

Defendant relies on *Mahorney v. Wallman* (10th Cir. 1990) 917 F.2d 469. However, we find this case distinguishable from the one before us. In *Mahorney*, the prosecutor stated during voir dire that the "presumption of a person being innocent was designed to protect those persons who are, indeed, not guilty of a crime." (*Id.* at p. 471.) Defense counsel's objection, request for admonition, and motion for mistrial were overruled. (*Ibid.*) During closing argument, the prosecutor stated: "I submit to you at this time, under the law and under the evidence, that that presumption has been removed, that that presumption no longer exists, that that presumption has been removed by evidence and he is standing before you now guilty. That presumption is not there any more." (*Ibid.*) Defense counsel's objection, request for admonition, and motion for a mistrial were again overruled. (*Ibid.*) However, unlike in *Mahorney*, here, the trial court did not indicate that the prosecutor's statements were proper. Moreover, the trial court's instructions in the present case were specific enough to preserve the presumption of innocence.

17

### E.  Cumulative Error

Defendant next contends that this court should reverse the judgment based upon the cumulative effect of the errors.  Since we have found no error, we reject this contention.

### III.    Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Grover, J.